UNITED STATES of America,
Plaintiff–Appellee,

v.

Parker D. LANGSTON, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Huey Lee FRANCIS, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Enoch McILROY, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

William McILROY, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

James McILROY, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Speck Aron ROSS, Defendant–Appellant.

Nos. 91–2003, 91–2013 to 91–2016, 91–2024.

United States Court of Appeals,
Tenth Circuit.

July 2, 1992.

Mary Y.C. Han, Albuquerque, N.M., for defendant-appellant Huey Lee Francis.

Richard J. Knowles, Albuquerque, N.M., for defendant-appellant Enoch McIlroy.

Ward Casey, Fort Worth, Tex., for defendant-appellant William Kelly McIlroy.

Nancy Hollander of Freedman, Boyd, Daniels, Peifer, Hollander, Guttmann & Goldberg, P.A., Albuquerque, N.M., for defendant-appellant Speck Aron Ross.

Presiliano Torrez, Asst. U.S. Atty., Albuquerque, N.M. (Don J. Svet, U.S. Atty., and Louis E. Valencia, Asst. U.S. Atty., Albuquerque, N.M., on the brief), for plaintiff-appellee.

Randy Schaffer, P.C., Houston, Tex., on the brief, for defendant-appellant Parker D. Langston.

David L. Plotsky, Albuquerque, N.M., on the brief, for defendant-appellant James McIlroy.

Before BRORBY and HOLLOWAY, Circuit Judges, and KANE, District Judge.*

HOLLOWAY, Circuit Judge.

Following a jury trial and guilty verdicts in September 1990, the defendants-appellants were convicted on counts of an indictment charging them with participating in a criminal drug manufacturing conspiracy, *inter alia.* In their appeals the defendants challenge the convictions on the grounds that: (1) the district court erred in refusing to suppress evidence obtained in an unreasonable automobile search; (2) the discretionary choice of a federal forum by state investigators deprived them of due process; (3) the government engaged in prosecutorial misconduct at trial, including the presentation of false testimony; (4) the search of a small, enclosed trailer, not described in a warrant that authorized the search of nearby property, violated the Fourth Amendment; and (5) the district court erred in admitting hearsay evidence. In addition, three of the defendants assert that the evidence was insufficient to support their convictions of the criminal drug conspiracy and of aiding and abetting in the manufacture of amphetamine.

The appeals have been consolidated and will be decided by this opinion. We find no reversible error and accordingly affirm.

## I. BACKGROUND

In mid-July 1989, the New Mexico State Police began investigating a suspected clandestine drug laboratory at the 56,000-acre C.A. Ranch. The investigation followed a tip by ranch employees that suspicious events began occurring after a group of men arrived as the guests of one of the owners, Joseph M. Lloyd, who was living and working on the ranch. A few days later, Lloyd and his guests departed separately from the ranch. The state police located Lloyd's car, in which defendant Francis was a passenger, soon after it left the ranch. Searching the trunk, a state trooper found approximately 11 pounds of amphetamine in plastic bags. In a subsequent search at the ranch, state and federal investigators seized approximately one pound of amphetamine, laboratory equipment, and chemicals.

As a result of a plea agreement, Lloyd testified as a government witness in the defendants' prosecution. Viewed in the light most favorable to the government, Lloyd's testimony, as well as other prosecution evidence, showed that five of the defendants, Francis, the three McIlroys, and Ross, visited the ranch on an invitation that Lloyd extended through a mutual friend. Lloyd testified that he had invited the defendants to visit the ranch for the purpose of reconnoitering for deer hunting.

Lloyd explained at trial that the visitors failed to show up late on July 5 at a prearranged meeting place near Sweetwater, Texas, from which he was supposed to have guided them to the ranch. The government presented evidence that in Lloyd's absence, a truck driven by defendant Langston transported to the ranch the equipment and chemicals for an amphetamine laboratory, as well as four men, defendants Francis, Enoch and William McIlroy, and Ross.

Lloyd testified that upon his return to the ranch on July 6, he was surprised to find three waiting visitors, Francis, William McIlroy, and Ross. Accompanying the three men to the basement of the main ranch house, Lloyd observed what was de-

---

* Honorable John L. Kane, Jr., United States District Judge for the District of Colorado, sitting by designation.

scribed to him as an amphetamine laboratory.

The government's evidence showed that before Lloyd's arrival, the ranch foreman, Rogers, gave Enoch McIlroy a ride to Tucumcari, New Mexico, to meet James McIlroy, his father. Following Lloyd's return to the ranch, James and Enoch McIlroy arrived in a pickup truck towing a small, enclosed trailer carrying ether.

Lloyd testified that all of the visitors took turns overseeing the amphetamine cooking process 24 hours a day. On approximately July 8, the visitors moved the operation to a trailer house in order to conduct a potentially violent chemical reaction. On July 11, William McIlroy, expressing concern about discovery, left the ranch and did not return.

The government's evidence showed that the ranch foreman and his wife became suspicious, at least in part because the visitors seemed to stay up all night and because in the evenings a strong, stinging chemical odor permeated the ranch headquarters area. On July 11, the foreman Rogers and a ranch employee reported the activities at the ranch to a New Mexico State Police lieutenant in nearby Las Vegas. In response, the state police visited the ranch and conducted aerial surveillance.

The prosecution presented evidence that because the final chemical process involved the use of potentially dangerous ether, the visitors moved the operation to the ruins at an abandoned homesite on the ranch. Lloyd rented a generator in Santa Fe on July 12 to supply power to the remote laboratory. On July 13, as the laboratory operators were conducting the final process, Langston made a second, brief visit to the ranch.

Beginning late on July 15, four of the defendants (Enoch and James McIlroy, Huey Francis, and Speck Ross) spent five or six hours cleaning up the main house and packaging the equipment. Enoch and James McIlroy and Ross then left the ranch. Late in the morning on July 16, Lloyd and Francis left the ranch bound for Fort Worth. The foreman's wife reported their departure to the state police.

A state police officer spotted and followed the car that Lloyd was driving near Tucumcari, New Mexico. Lloyd testified that he stopped voluntarily when the officer pulled up alongside him. Searching the trunk, the officer found a plastic garbage bag containing approximately 11 pounds of amphetamine. Later in the day, narcotics agents executing a search warrant at the C.A. Ranch seized laboratory equipment and chemicals from the basement of the main ranch house and from the trailer that James and Enoch McIlroy had towed to the ranch. In addition, the agents discovered approximately one pound of amphetamine in a night table in a bedroom in the house.

Lloyd eventually began cooperating with the government, and on October 24, 1989, gave a statement about the laboratory operation that implicated the defendants. In November 1989, a grand jury returned an indictment naming the six defendants.[1]

At trial, the appealing defendants did not testify. Instead, the defense presented witnesses whose testimony primarily challenged the credibility of Lloyd's testimony

1. A four-count indictment dated November 14, 1989, charged the defendants as follows:

Count I charged Huey Lee Francis, Parker D. Langston, Enoch McIlroy, James McIlroy, William McIlroy, Speck Aron Ross, and Mike South with conspiring to manufacture more than 500 grams of amphetamine, and aiding and abetting, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), 21 U.S.C. § 846, and 18 U.S.C. § 2. The conspiracy was alleged to have occurred from on or about June 26, 1989, until and through July 16, 1989, in the District of New Mexico and elsewhere.

Count II charged the six appealing defendants and South with manufacturing more than 500 grams of amphetamine, and aiding and abetting, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2.

Count III charged the six appealing defendants and South with possession with intent to distribute more than 500 grams of amphetamine, and aiding and abetting, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2.

Count IV charged Francis with the carrying or use of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1) and 21 U.S.C. § 841(a)(1) and (b)(1)(C).

on behalf of the government. The testimony of an expert witness called by the defense challenged the credibility of Lloyd's denial on direct examination that he used amphetamine following his arrest. Several character witnesses testified for Langston. In addition, the defendants asserted legal errors, including the admission of evidence seized in violation of the Fourth Amendment and prosecutorial misconduct.

Following the jury trial in September 1990, the six defendants who are here appealing were convicted of: (1) conspiracy to manufacture more than 500 grams of amphetamine, and (2) the manufacture of more than 500 grams of amphetamine. In addition, Francis, James McIlroy, and Ross were convicted of possession with intent to distribute more than 500 grams of amphetamine and aiding and abetting. Francis was convicted of the carrying or use of a firearm during and in relation to a drug trafficking crime. Mike South was acquitted on all charges.

## II. SUPPRESSION OF EVIDENCE SEIZED IN AUTOMOBILE SEARCH

■ Francis contends that the district court erred in denying his motion to suppress the amphetamine seized from the trunk of Lloyd's automobile. Francis asserts that the court should have suppressed the seized amphetamine as the fruit of an improper, warrantless automobile search. In reviewing the denial of a motion to suppress evidence, we "accept the trial court's findings of fact, unless clearly erroneous." *United States v. McAlpine*, 919 F.2d 1461, 1463 (10th Cir.1990). We review

the district court's legal conclusions *de novo*. *E.g., United States v. Wright*, 932 F.2d 868, 877 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 448 *and cert. denied,* —— U.S. ——, 112 S.Ct. 450, 116 L.Ed.2d 467 (1991).

The evidence presented at the suppression hearing, viewed favorably to the trial judge's ruling on the motions to suppress, showed the following: Late in the morning on July 16, 1989, Lloyd and Francis left the C.A. Ranch in a 1984 Oldsmobile Ninety–Eight. Locating the car while patrolling the Tucumcari area, New Mexico State Police Officer Siebenaler drove alongside it. The officer testified that after he made eye contact with Lloyd, who was driving, Lloyd slowed and then stopped the car on the shoulder.

Siebenaler testified that in response to his request for permission to search the trunk, Lloyd replied "sure" and opened the trunk. V R. 49. Inside the trunk, Siebenaler said he observed a plastic bag that Lloyd told him contained "some dirty clothes." *Id.* Siebenaler testified that when he asked to look inside the garbage bag, Lloyd hesitated but again replied "sure." *Id.* at 50.[2] Making an existing opening in the bag larger and pushing some clothes aside, Siebenaler found clear plastic bags that contained a white powdery substance later identified as amphetamine.

■ As a threshold matter, we address the passenger Francis' standing to challenge the automobile search and the seizure of the amphetamine.[3] In order to

---

**2.** The officer said that in response, Lloyd tore open the bag and exposed an article of clothing, but quickly closed it again. V R. 50. Siebenaler said he then asked Lloyd to move the bag; when Lloyd complied, the officer said he observed that it sagged. *Id.* at 51.

**3.** We address briefly Francis' contention that the search followed a pretextual traffic stop. As a passenger in the car, Francis could have had standing to challenge a traffic "stop." *See United States v. Erwin*, 875 F.2d 268, 269–70 (10th Cir.1989) (ruling automobile passenger could challenge traffic stop as separate issue from standing to challenge to subsequent search).

We find no error in the district court's conclusion that no "stop" occurred; we feel the record shows a voluntary police/citizen encounter.

The uncontested evidence at the suppression hearing showed that Lloyd voluntarily stopped the car soon after the state police officer, driving alongside, made eye contact with him. In Siebenaler's undisputed testimony, Lloyd "stopped on his own." V R. 47. Siebenaler turned on the emergency lights on his patrol car for the first time after he parked on the shoulder.

Whether an encounter between a police officer and another person is consensual "depends on whether a reasonable person under the cir-

challenge the legality of a search or a seizure through a motion to suppress, a defendant bears the burden of demonstrating a violation of his or her personal Fourth Amendment rights. *United States v. Erwin*, 875 F.2d 268, .270 (10th Cir.1989) (citing *Rakas v. Illinois*, 439 U.S. 128, 131 n. 1, 140, 99 S.Ct. 421, 424 n.' 1, 428, 58 L.Ed.2d 387 (1978)). Whether a defendant has standing to challenge a search and seizure depends upon whether "the defendant manifested a subjective expectation of privacy in the area searched and whether society is prepared to recognize that expectation as objectively reasonable." *Erwin*, 875 F.2d at 270.

■ We conclude that on the evidence presented at the suppression hearing, the district court did not err in ruling that Francis did not demonstrate standing to challenge the legality of the search and seizure of the evidence in the trunk. Francis defaulted in carrying his burden of establishing at the hearing that he had a protectable privacy interest in the plastic bag in the trunk. The government's uncontested evidence at the suppression hearing showed that Francis remained silent while Lloyd consented to, and assisted in, the search of the trunk.

■ Even if we could conclude that Francis had standing to challenge the search and the seizure of the amphetamine, we would affirm the district court's ruling denying the motion to suppress. We reject Francis' objection premised on the assertion that Lloyd lacked the authority to consent to the search. A police officer must reasonably believe, based upon "the facts available to the officer at the moment" of the search, that the person giving consent has authority over the area to be searched. *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 2801, 111 L.Ed.2d 148 (1990); *see also McAlpine*, 919 F.2d at 1465 (applying *Rodriguez* standard). Applying this

standard, we conclude that at the time of the search the officer could reasonably have believed that Lloyd had authority to consent to the search of the trunk. By remaining silent while the driver consented to, and assisted in, the search, Francis did not give the officer any reason to believe that he had an interest in the items in the trunk.

■ We also reject Francis' contention that the officer improperly opened a closed container within the trunk. We test the scope of a consensual search by asking: "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, — U.S. —, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991). The officer's undisputed testimony showed that Lloyd gave unconditional permission for him to search first the trunk, and then the container. Lloyd placed no restrictions on a search of the trunk; he is said to have just replied "sure."

## III. DUE PROCESS VIOLATION IN POLICE INVESTIGATORS' DISCRETIONARY CHOICE OF A FEDERAL FORUM

■ We next address whether the law enforcement officers who investigated the amphetamine laboratory at the ranch deprived the defendants of due process in referring their cases for prosecution to the United States Attorney rather than to a New Mexico state prosecutor. Francis and Ross seek to invoke due process protections because they contend that the discretionary referral decision subjected them to harsher penalties under the federal Sentencing Guidelines than they would have faced had they been prosecuted in a New Mexico state court.

On July 16, 1989, the day of Lloyd's arrest and the seizure of the amphetamine,

cumstances would believe [he or] she was not free to leave and/or disregard the official's request for information." *United States v. Werking*, 915 F.2d 1404, 1408 (10th Cir.1990). Arguably a driver might be somewhat nervous about, or even intimidated by, being followed on the highway by a police car, or by observing a

police officer driving alongside on a two-lane highway and staring. However, the officer's actions did not indicate that Lloyd was not free to continue driving. The facts support the conclusion that what occurred was, at least initially, a consensual encounter between a police officer and a private citizen.

agents of the New Mexico State Police sought assistance from the office of the state prosecutor in Las Vegas to obtain a warrant to search the C.A. Ranch. The testimony at an evidentiary hearing showed that then-Deputy District Attorney Montoya assisted the agents in obtaining a state district judge's approval of the warrant. Later in the day the state police, assisted by agents of the federal Drug Enforcement Administration ("the DEA"), executed the warrant. The federal prosecution of Lloyd began the next day, on July 17, when the government filed a federal complaint in the District of New Mexico, supported by a DEA agent's affidavit. Although state prosecutor Montoya testified that initially he intended to file state charges in the case, none were filed.

One premise of the defendants' argument is that increased due process protections apply to state police investigators' choice of a federal forum for prosecution because the decision is significant to the ultimate charging decision. However, our due process analysis places the responsibility for the ultimate charging decision "solely" upon prosecutors. *United States v. Andersen*, 940 F.2d 593, 597 (10th Cir. 1991). Members of police agencies

> have some influence on charging decisions. They make the initial decision whether to refer a case to federal or state prosecutors. They also may confer with prosecutors as charging decisions are made. *The ultimate decision about whether to charge a defendant, and what charges to file, however, rests solely with state and federal prosecutors.* Absent convincing evidence to the contrary, we will not assume that prosecutors are acting as "rubber stamps" for charging decisions made by [police investigators].

940 F.2d at 597 (citation omitted) (emphasis added).

Francis and Ross contend they were deprived of due process under the Fifth Amendment because the absence of written policy guidelines enabled investigators to make the referral decision arbitrarily. However, we previously have rejected similar arguments by explaining:

> In the absence of proof that the choice of forum was improperly motivated or based on an impermissible classification as a matter of constitutional law, the prosecutor's discretion to prosecute in a federal rather than a state forum does not violate due process or equal protection *notwithstanding the lack of any articulated guidelines for the exercise of such discretion.*

*United States v. Morehead*, 959 F.2d 1489, 1499 (10th Cir.1992) (emphasis added). Further, we have held that the Constitution does not mandate written policies to guide police investigators' referral decisions. *Andersen*, 940 F.2d at 597.[4] The New Mexico State Police did not violate due process by referring the case for prosecution in a federal forum in the absence of any written policy guidelines.

 The mere fact that police investigators refer a case to federal, rather than state, prosecutors because harsher penalties potentially are available under federal statutes does not deprive a defendant of due process. A prosecutor, who is responsible for the charging decision, is permitted to consider the same factor. *See, e.g., United States v. Batchelder*, 442 U.S. 114, 125, 99 S.Ct. 2198, 2204–05, 60 L.Ed.2d 755 (1979) (explaining a "prosecutor may be influenced by the penalties available upon conviction, but this fact, standing alone, does not give rise to a violation of the Equal Protection or Due Process Clause"), *quoted in Andersen*, 940 F.2d at 596; *see also Morehead*, 959 F.2d at 1499 (explaining more severe consequences of federal

---

**4.** The defendants rely in large part upon a holding that we have since reversed. *See United States v. Williams*, 746 F.Supp. 1076 (D.Utah 1990), *aff'd in part and rev'd in part, United States v. Williams*, 963 F.2d 1337, 1341–42 (10th Cir.1992). In the district court decision, the judge had held that "procedural due process protections are required" in the decision by law enforcement officers to present a case either to state or federal prosecutors. 746 F.Supp. at 1080. We rejected that analysis because there was "no evidence in the record that the referral to federal prosecutors was based on race or other impermissible reasons." *Williams*, 963 F.2d at 1342.

conviction do not "render the government's choice of a federal forum unconstitutional"); *United States v. Cook*, 949 F.2d 289, 291 (10th Cir.1991) (explaining a "defendant's due process rights are not violated by the federal government's decision to prosecute under a federal, rather than state, statute, notwithstanding the harsher penalties").

Because the defendants have not demonstrated a deprivation of due process, we find no error in the district court's denial of their request for a downward departure under the Sentencing Guidelines, or sentencing under the state sentencing scheme, to remedy an alleged due process violation. *See Morehead*, 959 F.2d at 1498–99 (rejecting downward departure on basis of argument that prosecutor violated due process in arbitrarily choosing federal forum).

## IV. ALLEGATIONS OF PROSECUTORIAL MISCONDUCT

Next, we consider allegations of prosecutorial misconduct, including the defendants' contentions that prosecutors knowingly presented false testimony, posed an improper hypothetical to a witness, and made improper argument.

### A. *The Allegation of Knowing Presentation of False Testimony*

At the same time the criminal prosecution of Lloyd was underway in the fall of 1989, the government was preparing a collateral civil proceeding to forfeit his interest in the C.A. Ranch. During direct examination at trial, Lloyd stated that he had neither discussed nor negotiated concerning forfeiture with anyone in the United States Attorney's office. Under cross-examination, Lloyd conceded that his testimony that he had not *discussed* the forfeiture with prosecutors was "[n]ot entirely true" because prior to trial they had questioned him about his "knowledge of the forfeiture." VIII R. 482–84.

The defendants argue that Lloyd's statement on direct examination was false testimony that prosecutors had an obligation to correct. They invoke the general principle that the prosecution's knowing use of false evidence violates due process, regardless of whether the evidence goes to a substantive issue or merely to the witness' credibility. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). In addition, prosecutors have "the responsibility and duty to correct [testimony they know] to be false and elicit the truth." *Napue*, 360 U.S. at 270, 79 S.Ct. at 1177; *see also, e.g., Tapia v. Tansy*, 926 F.2d 1554, 1563 n. 15 (10th Cir.) (noting prosecutors must correct false testimony), *cert. denied*, —— U.S. ——, 112 S.Ct. 115, 116 L.Ed.2d 84 (1991).

In order to establish a deprivation of due process, the defendants also bore the burden of demonstrating that the false testimony was material. The test for materiality is the same as the test for harmless constitutional error. *United States v. Bagley*, 473 U.S. 667, 679 n. 9, 680, 105 S.Ct. 3375, 3382 & n. 9, 87 L.Ed.2d 481 (1985). The test for harmless constitutional error is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Yates v. Evatt*, —— U.S. ——, 111 S.Ct. 1884, 1892, 114 L.Ed.2d 432 (1991) (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)). "To say that an error did not contribute to the verdict is, rather to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record." *Yates*, 111 S.Ct. at 1893. *Yates* thus instructs us "to make a judgment about the significance" of the tainted evidence relative to the remaining evidence. *Id.*

We conclude in any event that there was no reversible error. Giving careful consideration to Lloyd's incorrect statement on direct examination, we are satisfied that it was not material. On cross-examination Lloyd testified about his knowledge of the forfeiture proceedings, as well as about his pretrial discussions with prosecutors on the subject. These circumstances were extensively covered by defense counsels' questioning. Viewing the

record as a whole, we are satisfied beyond a reasonable doubt that Lloyd's statement did not contribute to the verdict. *See Yates v. Evatt,* 111 S.Ct. at 1892–93.

■■■ The defendants also argue that the prosecution sponsored false testimony about Lloyd's pretrial drug use. Lloyd testified that he had not used amphetamine after his arrest. However, three of Lloyd's pretrial urine drug tests reflected the presence of controlled substances, including amphetamine. Two of those tests are emphasized in these appeals. During direct examination Lloyd testified that he had frequently used antihistamines, antibiotics, and other medications.

We again find no reversible error. It is true that the defendants can point to extensive evidence that arguably impeached Lloyd's credibility on the issue of the positive urine drug tests. This issue was also fully developed before the jury and Lloyd was extensively cross-examined and impeached. Assuming Lloyd's testimony was false, we are satisfied that his denial of pretrial amphetamine use, and his attempted explanation for the positive test results, did not contribute to the verdict under the *Yates v. Evatt* test.

### B. *The 'Vicks Inhaler' Hypothetical*

■■■ The defendants next assert that a prosecutor posed an improper hypothetical question to an expert witness for the defense on the subject of the possible causes of Lloyd's positive drug tests. The prosecutor asked the witness whether two specific nasal inhalers, including a Vicks Inhaler, contained amphetamine. The witness replied, "The Vick's inhaler is capable of causing a ... positive test result for methamphetamine and for amphetamine" on some tests. XIII R. 1488. The defendants contend that the prosecutor's hypothetical was improper because the government presented no proof that Lloyd used the product.

Applying the analysis we would use to test the knowing presentation of false evidence, we conclude the testimony on this issue was at most harmless error. The defense expert's testimony made it at the

least highly unlikely that either of the two positive tests could have resulted from the use of a Vicks Inhaler. Considering all of the evidence, we conclude the Vicks Inhaler hypothetical did not contribute to the verdict.

The defendants assert as additional error a prosecutor's statement during closing argument that some nasal inhalers, including a Vicks Inhaler, could cause a positive test result for amphetamine, which was a possibility that the expert witness had discounted. We "will not overturn a conviction on account of improper argument by the prosecutor 'unless the prosecutor's misconduct "was enough to influence the jury to render a conviction on grounds beyond the admissible evidence presented." ' " *United States v. Pena,* 930 F.2d 1486, 1491 (10th Cir.1991) (quoting *United States v. Espinosa,* 771 F.2d 1382, 1401 (10th Cir.), *cert. denied,* 474 U.S. 1023, 106 S.Ct. 579, 88 L.Ed.2d 561 (1985) (in turn quoting *United States v. Dickey,* 736 F.2d 571, 596 (10th Cir.1984), *cert. denied,* 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985))). We must consider an improper comment during argument "against the backdrop of the entire record before the jury." *Pena,* 930 F.2d at 1491.

We conclude the prosecutor's comment was insignificant when viewed with the expert witness' forceful rejection of the possibility that a nasal inhaler could have caused the positive test results. In addition, the district judge reminded the jury to "recall the evidence," and formally instructed the jury that the attorneys' arguments were not evidence. Considering the entire record on the issue, we conclude that the prosecutor's comment had no effect on the jury's verdict.

### C. *Prosecutor's Comment About Defense Counsel's Motives*

■■■ The defendants contend that reversal is also warranted because during closing argument a prosecutor impugned one of the defense attorney's motives for questioning Lloyd about his reasons for entering into a plea agreement. The prosecutor remarked that some of the defense coun-

sel's reasons for asking a particular series of questions evinced "an improper purpose." XIV R. 1638. The prosecutor was interrupted immediately by an objection to the remark. The judge sustained the objection and, at defense counsel's request, instructed the jury to "disregard [the prosecutor's] remarks about counsel's state of mind." *Id.*

The defendants have not demonstrated that the prosecutor's comment warrants a new trial. Any possible prejudice was diminished because the trial court promptly issued a curative instruction. We conclude that the comment did not influence the jury to convict the defendants.

## V. ADMISSION OF EVIDENCE SEIZED IN SEARCH OF UTILITY TRAILER AT RANCH

Enoch McIlroy argues that the district court erred by not suppressing evidence consisting of a cache of laboratory equipment and chemicals seized from the utility trailer that he and his father James towed to the ranch. Around midnight on July 6, Lloyd met Enoch and James, who were towing the trailer, at the top of a hill near the entrance to the ranch. VII R. 244–45. Enoch challenges the search of the trailer as a violation of the requirement of the Fourth Amendment that warrants describe with particularity the places to be searched.

Following Lloyd's departure from the ranch on July 16, 1989, investigators of the New Mexico State Police and the DEA conducted a search at the C.A. Ranch on the basis of a warrant authorized by a state judge. The agents conducted the search in what was described at trial as the ranch "headquarters area," the area surrounding the main ranch house in which were located the ranch foreman's residence, a trailer house, barns, a horse shed, corrals, a water tower, and some outbuildings.

Enoch's argument focuses upon the language in the search warrant that described the place to be searched. Accompanying the warrant under the heading "DESCRIPTION OF PROPERTY TO BE SEARCHED" was a description of the geographic location of the ranch, as well as a general description of the structures in the headquarters area.[5] The warrant itself did not mention the utility trailer. However, in the supporting affidavit, which was incorporated into the warrant through preprinted language,[6] the affiant stated that state police officers had observed the utility trailer parked near the main ranch house.[7] In

---

5. A separate page attached to the warrant contained two paragraphs, including:

DESCRIPTION OF PROPERTY TO BE SEARCHED

The Canon Del Agua Ranch, commonly known as the C.A. Ranch, which is located in San Miguel County approximately 11.5 miles South of State Road 104 and approximately ¼ mile East of State Road 67[.] The property is further described as having two white ranch houses, the main house being a large possibly two story dwelling with a pitch roof and being partially surrounded by a white [picket] fence. The second house being described as a smaller single story home with a pitched roof and being situated to the East of the main house. The property has a barn and shop located to the South of the main house, also a garage and several other outbuildings and sheds. An abandoned trailer house is located approximately 500 feet North of the main dwelling.

Government's Addendum at 7. On the same page was a one-paragraph description of the items to be seized.

6. The first paragraph of the warrant stated:

Proof by Affidavit for Search Warrant, having been submitted to me, I am satisfied that there is probable cause that the person named or property described in the Affidavit is located where alleged in the Affidavit and I find the ground[s] exist for the issuance of the Search Warrant. *A copy of the Affidavit is attached and made a part of this Warrant.* Government's Addendum at 6 (emphasis added).

7. The affiant, Day, a New Mexico State Police officer, related in the affidavit the observations of officers, including himself, who had visited the ranch on July 12 and 13, 1989. Day stated that on July 12 three officers interviewed ranch employees about the occurrences since the arrival of Lloyd's guests. Day stated that the employees told the officers that the visitors to the ranch "had brought a white utility or concession type trailer to the ranch. The officers observed the aforementioned trailer parked to the west of the main ranch house." Government's Addendum at 9.

Day stated that during his visit to the ranch with another officer on July 13 he had observed that "[a] small white utility or concession type trailer was parked to the west of the main house." *Id.*

a more general reference to "trailers," the affiant wrote that "clandestine laboratories are often established in remote, isolated areas and are quite frequently kept in trailers for mobility, and to hinder detection and apprehension efforts." Government's Addendum at 10.

Testimony at a suppression hearing showed that searchers found the trailer parked on the outside of a white picket fence that partially surrounded the main ranch house, at a distance from the main ranch house of approximately 20 or 30 feet. V R. 32. Opening the locked trailer, the searchers discovered items including barrels, chemicals, cans of ether, glassware, a small pump, a bottle of compressed gas, and bales of hay.

At a pretrial suppression hearing, the government presented no evidence other than the warrant. Ruling from the bench, the district court denied McIlroy's motion to suppress the evidence seized from the trailer.

## A. *Enoch McIlroy's Standing*

■ The government renews its argument that Enoch McIlroy does not have standing to challenge the search of the utility trailer. For the suppression hearing, Enoch McIlroy asserted in an affidavit that he had accompanied his father in towing the trailer to the ranch on July 7, 1989, as an invited guest of Lloyd. Enoch McIlroy stated also that "[d]uring our stay at the [r]anch we'd go back and forth between the trailer and the house," and that "[a]t various times, I had the key to the trailer." Enoch McIlroy's Aff. para. 8. McIlroy further stated that he recalled locking the trailer before he left the ranch, and that "[w]e ... intended to come back in about a month to pick up the trailer." *Id.* paras. 9–10. The government did not challenge McIlroy's assertions.

We conclude that Enoch's affidavit satisfied the requirements of Fourth Amendment standing. His affidavit showed that he had asserted some control over the trailer that supported his subjective privacy expectation. By locking the trailer before he left the ranch, Enoch manifested a sub-

jective expectation that the contents of the trailer would remain private. We conclude also that Enoch asserted an expectation of privacy in the trailer that "society is willing to recognize as 'reasonable.'" *United States v. Leary,* 846 F.2d 592, 595 (10th Cir.1988) (quoting *Hudson v. Palmer,* 468 U.S. 517, 525, 104 S.Ct. 3194, 3199, 82 L.Ed.2d 393 (1984) (in turn quoting in part *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring))). By locking the trailer before he left the ranch, McIlroy took a precaution "customarily taken by those seeking privacy." *Rakas v. Illinois,* 439 U.S. 128, 152, 99 S.Ct. 421, 435, 58 L.Ed.2d 387 (1978) (Powell, J., concurring).

## B. *Particularity in Warrant*

We next address Enoch's contention that the search was unlawful because the utility trailer was not listed in the warrant as one of the places to be searched. Enoch invokes the requirement in the Fourth Amendment that search warrants may not issue except those "particularly describing the places to be searched." U.S. Const. amend. IV. Concerning the descriptions of "places to be searched," we have said that "[t]he warrant must describe the place to be searched with sufficient particularity so that the executing officer can locate and identify it with reasonable effort. The requisite specificity of the description differs for rural and urban areas and depends heavily on the facts of each case." *United States v. Dorrough,* 927 F.2d 498, 500 (10th Cir.1991) (citations omitted).

■ The description here of the place to be searched begins: "The Canon Del Agua Ranch." A "single warrant may authorize the search of several different places or residences" as long as probable cause is shown for searching each place. *United States v. Rios,* 611 F.2d 1335, 1347 (10th Cir.1979). A warrant authorizing a search of the entire ranch could have been valid as long as probable cause existed to search the entire ranch. *See United States v. Alexander,* 761 F.2d 1294, 1301 (9th Cir. 1985) (holding warrant valid for search of 40-acre ranch). Interpreting the warrant

less expansively, however, the district court decided that it authorized the search of, at least, the "headquarters area" around the main ranch house.[8]

■ We agree that the warrant sufficiently identified the C.A. Ranch "headquarters area." It provided a geographical description of the headquarters area, along with a general description of the structures at the site. The description enabled the searching party to locate the C.A. Ranch headquarters area with a reasonable effort. We hold that the warrant sufficiently authorized the search of the nearby trailer.

■ Even if the utility trailer was searched and seized improperly, we hold that the admission of evidence seized was harmless constitutional error.[9] The harmless constitutional error analysis requires us to determine whether the tainted evidence contributed to the verdict. The evidence seized from the utility trailer consisted of laboratory equipment and some chemicals. From the basement of the main ranch house the search party seized large amounts of similar materials. We believe that the testimony about the activities and the contents connected to that basement was more significant than the testimony about the items seized from the trailer. At most, the evidence seized from the trailer was cumulative. We are satisfied beyond a reasonable doubt that the verdict would have been the same without the testimony about the items seized from the trailer.

## VI. ADMISSION OF ALLEGED HEARSAY EVIDENCE

■ Enoch McIlroy contends that the district court erred in admitting hearsay statements establishing the location at the ranch at which the searching party seized two laboratory instruments that bore his fingerprints. During the July 16 search, investigators seized chemicals and laboratory equipment from two primary locations at the ranch, the basement of the main house and the utility trailer parked outside. A latent fingerprint examiner testified that Enoch's fingerprints were on two of the seized laboratory instruments, a white ceramic funnel and a condenser tube.

We cannot agree with Enoch that the government established the locations at which the two items were found with inadmissible hearsay statements. Case agent Jacoby testified that he could recall seeing just one ceramic or porcelain funnel at the ranch and that it had been found in the basement. Jacoby testified that all of the condenser tubes seized at the ranch came from the basement. Jacoby further explained during cross-examination that he observed, as well as participated in, the seizures from the basement. Thus there appears to have been at least some evidence that Jacoby's testimony was based on firsthand information. Enoch has not demonstrated that the agent's testimony about the locations at which the two instruments were seized was inadmissible hearsay.[10]

8. Preceding its oral ruling during a suppression hearing on August 1, 1990, the district court commented that "the search warrant starts off, it says, '[t]he entire ranch [is] the description of the property to be searched.' Well, obviously ... it's 90 sections, and we're not probably going to search every section." V R. 42. The court then concluded that the utility trailer had been "well within the area that the search warrant goes to" because it had been in the immediate vicinity of the buildings described in the warrant. *Id.* at 42–43.

9. While the government did not assert that an erroneous admission of the evidence seized from the trailer would be harmless constitutional error, we initiate harmless error review. Other circuits have recognized that we may exercise our discretion to initiate harmless error review in an appropriate case. *United States v.*

*Giovannetti,* 928 F.2d 225, 227 (7th Cir.1991) (holding appeals court has "discretion to overlook a failure to argue harmlessness"); *see also United States v. Pryce,* 938 F.2d 1343, 1347 (D.C.Cir.1991) (initiating harmless error review), *cert. denied,* —— U.S. ——, 112 S.Ct. 1488, 117 L.Ed.2d 629 *and cert. denied,* —— U.S. ——, 112 S.Ct. 1679, 118 L.Ed.2d 396 (1992).

10. We also cannot find error in the district court's admission of a document that described the locations at which items were seized at the ranch. *See* II Supplemental R. McIlroy correctly notes that the agents who prepared the document, a "Return and Inventory" for the search warrant filed in state court following the search, did not observe the location at which each item was found, but rather relied on the case agent to tell them where the items had

## VII. SUFFICIENCY OF EVIDENCE OF CONSPIRACY

Langston, Enoch McIlroy, and William McIlroy each contend that the government presented insufficient evidence to support their convictions for conspiracy to manufacture amphetamine. In reviewing the sufficiency of the evidence of a criminal charge, we determine whether the "evidence—both direct and circumstantial, together with reasonable inferences to be drawn therefrom—is sufficient if, when taken in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Hooks*, 780 F.2d 1526, 1531 (10th Cir.), *cert. denied*, 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986).

The district court's instructions enabled the jury to consider finding the defendants guilty under either one of two theories, as principals in the conspiracy or as aiders and abettors to the conspiracy. In order to present sufficient evidence that a defendant is guilty of a criminal drug conspiracy as a principal under 21 U.S.C. § 846, the government carries the burden of proving: (1) "that two or more persons agreed to violate the law," [11] (2) "that the defendant knew at least the essential objectives of the conspiracy," and (3) "that the defendant knowingly and voluntarily became part of [the conspiracy]." *United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 199, 112 L.Ed.2d 161 (1990).

Even if the jury decided that the defendants were not principals, it could have concluded that they aided and abetted in the conspiracy. In order to be guilty as an aider and abettor under 18 U.S.C. § 2:

As this court said in *Roth v. United States*, 10 Cir., 339 F.2d 863, 865, "To be an aider and abettor requires that a defendant 'associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.' The proof must establish the commission of the offense by someone and the aiding and abetting by the defendant so charged." (footnotes omitted) See also, *Nye & Nissen v. United States*, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919....

*White v. United States*, 366 F.2d 474, 476 (10th Cir.1966); *see also, e.g., United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (stating general requirements of aiding and abetting).[12]

The aiding and abetting statute operates not to create a separate crime but instead to abolish "the common law distinction between principal and accessory." *United States v. Smith*, 838 F.2d 436, 441

---

been seized. X R. 884–85; XI R. 1111. The court admitted the document at the suggestion of defense counsel, and without objection. *Id.* at 1102.

Enoch has not made clear which of the government's trial evidence he believes was inadmissible hearsay. Assuming he intended to challenge the admission of the search warrant return, he did not preserve the error by making a timely objection at trial. *See United States v. Taylor*, 800 F.2d 1012, 1017 (10th Cir.1986), *cert. denied*, 484 U.S. 838, 108 S.Ct. 123, 98 L.Ed.2d 81 (1987) (stating general rule that "for a party to preserve alleged error for appeal, he must make a timely and *proper* objection").

11. Though not an issue in the appeal, we note briefly that the government presented ample evidence of an agreement between two or more persons to manufacture amphetamine. Government witness Lloyd described the establishment and operation of a laboratory, as well as the participation of the defendants there except Langston, who left after the four men were brought to the ranch headquarters. Lloyd's testimony was corroborated by other evidence, in particular the testimony of ranch employees and the evidence about the laboratory equipment and chemicals seized in the search. The amphetamine seized during the searches of the ranch and of Lloyd's automobile further corroborated Lloyd's testimony by showing that the laboratory had operated as he had described.

12. Though the parties did not address the issue, we note that as a prerequisite to aiding and abetting the government is required to prove that "someone has committed" the underlying substantive offense. *United States v. Rodgers*, 419 F.2d 1315, 1317 (10th Cir.1969); *see also, e.g., United States v. Hamblin*, 911 F.2d 551, 557 (11th Cir.1990) (describing as element of aiding and abetting proof that "substantive offense was committed"), *cert. denied*, —— U.S. ——, 111 S.Ct. 2241, 114 L.Ed.2d 482 (1991). We conclude that the government satisfied this requirement by presenting substantial evidence of a conspiracy to manufacture amphetamine.

(10th Cir.1988), *cert. denied,* 490 U.S. 1036 (1989). "A defendant can be convicted as an aider and abettor even though he was indicted as a principal for commission of the underlying offense and not as an aider and abettor, providing that commission of the underlying offense is also proven." *Id.* Thus, because the jury was instructed on both theories we should affirm the convictions if the government presented sufficient proof of either the substantive offense or of aiding and abetting.

### A. *Enoch McIlroy*

The government presented evidence from which the jury could infer that Enoch McIlroy arrived at the ranch early on July 6 with Francis, William McIlroy, and Ross as a passenger in the pickup truck driven by Langston. The evidence showed that Enoch left the ranch later in the day with the foreman to meet his father in Tucumcari; Enoch then accompanied his father back to the ranch in a pickup truck that was towing a utility trailer. Lloyd testified that upon meeting Enoch and James McIlroy upon their arrival at the ranch, he noticed that the utility trailer smelled of ether. Lloyd said James acknowledged that the trailer contained ether.

The government's evidence showed that Enoch remained at the ranch throughout the amphetamine manufacturing processes. In Lloyd's view, Enoch had a "very limited role" in the drug manufacturing operation, "mainly as a go-for or dirty work person" who did household chores. VII R. 272. However, describing the defendants' roles in the amphetamine manufacturing processes in the basement, Lloyd testified that "[m]ost of the time there was at least one observer in the basement watching the process, overseeing it. They all took turns at various points in the day." *Id.* at 251. The government presented testimony that Enoch's fingerprints were on two pieces of laboratory equipment, a white ceramic or porcelain funnel and a condenser tube. Lloyd testified that after the manufactur-

ing process was complete, Enoch participated in the five- or six-hour clean-up work that involved packaging the materials used in the laboratory and cleaning the house.

Enoch asserts the government's evidence of conspiracy was "equally consistent with both guilt and innocence," and consequently was insufficient to support the conviction. *Fox,* 902 F.2d at 1513–14. For example, Enoch contends that the government's proof that he assisted his father with the trailer, and did household chores, was consistent with his mere presence at the site of the drug manufacturing laboratory and was not sufficient to show that he participated in the conspiracy. *See, e.g., United States v. Savaiano,* 843 F.2d 1280, 1294 (10th Cir.) ("mere presence" at crime scene alone insufficient evidence of knowing participation in conspiracy).

We conclude that from the government's evidence the jury could reasonably infer that Enoch was aware of the amphetamine manufacturing operation. Enoch was at the ranch from the day the laboratory was set up to the day the process was completed. The evidence showed that Enoch rode to the ranch at one point in a vehicle reeking of ether; throughout the process, a pungent chemical odor was prominent at the ranch headquarters. From Lloyd's testimony that "all" of the visitors had taken turns overseeing the laboratory, the jury could have inferred that Enoch was knowledgeable about the conspiracy. Enoch's fingerprint on the laboratory instruments further supported the inference that he had firsthand knowledge about the operation.[13] In addition, the jury could infer Enoch's knowledge about, as well as his participation in, the operation from Lloyd's testimony that Enoch helped dismantle the laboratory. We conclude that the government presented sufficient evidence of Enoch's knowledge of the object of the conspiracy.

### B. *William McIlroy*

The government's evidence showed that Langston delivered William to the C.A.

---

**13.** Asked specifically whether he had seen Enoch McIlroy in the basement, Lloyd testified: "I never observed him in the basement." VII R.

**272.** The statement raised an issue for the jury to resolve about the weight to be given to Lloyd's testimony.

Ranch just prior to the laboratory start-up. Lloyd testified that upon his arrival at the ranch house later on the same day, Francis, William McIlroy, and Ross, collectively, explained the amphetamine operation to him and gave him a tour of the basement laboratory. William was present and participated as the men discussed aspects of the laboratory operation, including the danger of explosion, the measures taken to reduce the odor, the possibility of detection by ranch employees, and the expected duration of the manufacturing process.[14]

The government presented evidence that William made an earlier-than-planned departure from the ranch on July 11. Lloyd quoted William as explaining that he was dissatisfied with the operation because he did not feel that it was secure and he feared discovery.

We are persuaded from the conversation that occurred upon Lloyd's arrival at the ranch that the jury could have inferred that William McIlroy was knowledgeable about, and involved in, the manufacturing operation. In addition, the government presented evidence from which the jury could infer that William had taken his turn overseeing the manufacturing process.[15] In view of the evidence of William's knowledge about, and participation in, the laboratory operation, we are not persuaded by his argument that the circumstances were equally consistent with an innocent explanation for his presence at the ranch—to reconnoiter for a deer hunt.

## C. *Parker Langston*

■ The government's evidence placed Langston at the C.A. Ranch on two occasions. The government presented evidence that Langston arrived at the ranch on July 6, 1989, driving a four-door, red pickup truck that was towing an aluminum, stock trailer. The government presented direct and circumstantial evidence that the truck driven by Langston was transporting four of the defendants.[16] The ranch foreman testified that upon Langston's arrival all he could see through the cracks in the sides of the trailer was hay that appeared to be "real old" and "damaged." IX R. 650–51. Government witnesses testified that later in the day they observed similar hay piled outside the house around a window in the basement near a drum labeled "acetone." Lloyd testified that he arrived during the evening hours and was surprised to find that a functioning amphetamine laboratory had been set up in the basement. Lloyd asked the group—Ross, Francis, and William McIlroy—how they got to the ranch and they said that "Parker D. had brought them." VII R. 233.

Recalling Langston's second visit, Lloyd testified that early on July 13 he discovered Langston asleep on the couch in the living room of the main ranch house. Lloyd testified that he had been expecting Langston to return because "[o]ne of the parties at the house there ... I believe it was Jim McIlroy, had contacted him and asked him to come to the ranch to pick them and their equipment up." VII R. 274. Lloyd testified that at the time Francis, James McIlroy, and Ross were conducting a chemical process at some ruins located five or six miles from the ranch house. Lloyd said he told Langston that the men were at "some ruins ... and they should be back fairly soon." *Id.* at 275. Lloyd said he then

---

14. Lloyd testified that during his first conversation with the three men, just Francis remained silent. VII R. 230.

15. On cross-examination, Lloyd seemed to limit his testimony. Lloyd was asked: "You never saw Bill McIlroy do anything with your own eyes that had anything to do with the actual manufacture of amphetamine, did you?" Lloyd replied: "I sure didn't." VIII R. 477. Lloyd's arguably contradictory testimony on this point raised factual issues about William McIlroy's actual role in the operation that were for the jury to resolve.

16. The government's evidence showed that the "group" present when Lloyd arrived—Francis, William McIlroy, and Ross—explained collectively to Lloyd that "Parker D. had brought them." VII R. 232–33. From the evidence, the jury could have inferred that Enoch McIlroy also arrived at the ranch with Langston and the other three men. After the men arrived at the ranch, the foreman drove Enoch to Tucumcari to meet his father, James McIlroy.

went to work and did not see Langston again.

While not strong, we feel the indication from all the evidence is that a substantial portion of the laboratory equipment was transported to the ranch by the trailer that was pulled by Langston with the pickup. The trailer was an open stock trailer, not a sealed container.[17] The ranch foreman, Rogers, testified about old, rotten hay, a barrel, and a garden hose and "this and that," which he saw outside the ranch house. Rogers was asked who left the hay there, and he replied, "Well, this bunch of guys that was there, they left it all there." IX R. 673.

The testimony about Langston's second trip to the ranch provided at least some additional evidence that he knew about the cargo on the trailer. Lloyd's testimony that James McIlroy had contacted Langston near the end of the manufacturing process to pick up the men "and their equipment" was evidence from which the jury could infer that Langston knew he had transported laboratory materials to the ranch. We conclude the government presented at least some evidence from which the jury could have inferred that Langston knew the contents of the trailer.

In sum, the evidence concerning Langston's conviction on the charge of conspiracy to manufacture amphetamine is not strong. Nevertheless, we feel it is sufficient to hold, as we do, that viewed in the light most favorable to the jury's verdict, it supports Langston's conviction as one who aided and abetted in the conspiracy. The jury could reasonably infer that Langston transported the four men and a substantial part of the laboratory equipment to the ranch for the apparent purpose of carrying out the unlawful scheme.

## VIII. SUFFICIENCY OF EVIDENCE OF THE MANUFACTURE OF AMPHETAMINE

■ Parker Langston and Enoch and William McIlroy next argue that the government presented insufficient evidence that they manufactured, or aided and abetted in the manufacture of, amphetamine. The second count of the indictment, upon which each of the three was convicted, charged them with manufacturing more than 500 grams of amphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and aiding and abetting in violation of 18 U.S.C. § 2.

As the trial judge instructed the jury, in order to "prove that a defendant has manufactured amphetamine, the government must show that a defendant manufactured the drug and did so knowingly or intentionally." *United States v. Litteral*, 910 F.2d 547, 550 (9th Cir.1990); *see* 21 U.S.C. § 841(a)(1). In addition, the judge instructed the jury that it could convict the defendants of the count if they aided and abetted in the manufacture of amphetamine.

Viewing the evidence in the light most favorable to the government, it could be found that Enoch and William knowingly participated to some extent in the amphetamine manufacturing operation. The approximately eleven pounds of amphetamine discovered in the trunk of the car Lloyd was driving on July 16 are further proof of the completion of the unlawful operation. And again, while not strong, we feel the evidence was sufficient to show that Langston performed a role in the laboratory operation by transporting the equipment and personnel for the project to the ranch, thus aiding and abetting the manufacturing offense itself. We hold that the evidence was sufficient for the jury to have

17. We can distinguish the cases that Langston cites in support of his argument that the government's evidence was insufficient to show that he knew that the cargo in the trailer was laboratory equipment. The jury could infer more than merely that Langston was a passenger in an enclosed, padlocked truck, as in *United States v. Cooper*, 567 F.2d 252, 254–55 (3d Cir. 1977). Rather, the jury could infer that he was the operator of an open stock trailer delivering equipment and passengers to a distant site. Unlike the circumstances in *United States v. Gomez*, 776 F.2d 542, 549 (5th Cir.1985), the government presented evidence that Langston did more than merely associate with, or chauffeur, the conspirators. Instead, the jury could infer that Langston furthered the conspiracy by delivering the personnel and equipment for the laboratory, and then returned when called to pick them up.

found the necessary elements to convict these three defendants of the offense of manufacturing amphetamine.

## IX. CONCLUSION

No reversible error has been demonstrated as to any of the convictions and sentences, and they are accordingly

AFFIRMED.