**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Bridget M. DENNY–SHAFFER,**
**Defendant–Appellant.**

**No. 92–2144.**

United States Court of Appeals,
Tenth Circuit.

Aug. 9, 1993.

Rhonda P. Backinoff, Asst. U.S. Atty., Albuquerque, NM (Don J. Svet, U.S. Atty., with her on the brief), for plaintiff-appellee.

Teresa E. Storch, Asst. Federal Public Defender, Albuquerque, NM, for defendant-appellant.

Before LOGAN, HOLLOWAY and SEYMOUR, Circuit Judges.

HOLLOWAY, Circuit Judge.

Defendant Bridget Denny–Shaffer appeals her conviction and sentence under 18 U.S.C. § 1201(a)(1). The indictment charged that the defendant "wilfully and knowingly did transport in interstate commerce" from New Mexico to Texas and Minnesota a child "Kevin Daniel Chavez, who has been unlawfully seized, kidnapped, carried away and held by the defendant ... for the purpose of keeping the child ... as her own." The defense of Ms. Denny–Shaffer—a victim of multiple personality disorder (MPD)—was insanity within the meaning of 18 U.S.C. § 17(a). The trial judge rejected the insanity defense and instructions requested on it at the conclusion of the trial for insufficiency of proof by defendant under § 17(a). Defendant was then found guilty by the judge after a jury determination was waived.

The central issue on appeal is whether the trial judge erred in rejecting the insanity defense for insufficiency of the evidence thereon, and in refusing to submit jury instructions on the defense. Being convinced that the evidence required the submission of the defense, we reverse.

## I

### THE KIDNAPPING

The record reveals the following facts concerning the taking of the child, which were basically not in dispute at the trial.

In 1990 and 1991, Denny–Shaffer was employed as a labor and delivery nurse at Rehoboth Hospital in Gallup, New Mexico. On May 10, 1991, at about 5:40 a.m., defendant entered the Memorial General Hospital in Las Cruces, New Mexico, wearing a lab jacket and identifying herself as a University of New Mexico (UNM) medical student named Linda. *See* III R. at 42–44. She went to the nursery where she inspected several babies, including Kevin, claiming to be doing a pediatrics rotation for the UNM medical school. *See id.* at 48–51. While unobserved by other hospital personnel, Denny–Shaffer picked up the infant, hid him under her arm and left the hospital. She then got into her car and headed for Texas with the baby. *See* VIII R. at 1007–08, 1014–15. The same evening, she

arrived at the Bryan, Texas, home of her former boyfriend, Jesse Palomares. According to him, defendant appeared to be pregnant. *See* III R. at 145–48.

About noon the next day, defendant telephoned Palomares at work and asked him to return home. When Palomares arrived at his house, he saw defendant in bed with an infant in her arms. Defendant told Palomares: "This is your little one." *Id.* at 150. There was blood on the sheets and carpet. Palomares also noticed a bag containing a human placenta. *See id.* at 151, 153. Defendant asked him to bury the placenta in the front yard next to where his son's placenta was buried. Defendant refused any medical attention. Palomares had doubts as to the paternity of the baby. He made it clear to defendant that whether or not he was the baby's father, he did not want to maintain a romantic relationship with her. *See id.* at 161–62.

After a few days in Bryan, defendant left to join her family, including her mother and teenage daughter, Genesis, in Minnesota. While in Minnesota, defendant presented and treated the stolen baby as her own. *See* IV R. at 378–79; VI R. at 634.

On May 20, 1991, defendant had a telephone conversation with her supervisor at Rehoboth Hospital, Beatrice Cowdry. Before leaving New Mexico, defendant had told Cowdry that she had a baby with her Texas boyfriend, Palomares. *See* IV R. at 252–53. During the call, defendant told Cowdry that she was going to return to New Mexico with the baby, but that it had not grown. *See id.* at 269–70. Cowdry could hear an infant crying in the background. *See id.* at 270. Cowdry knew about the Las Cruces kidnapping and became suspicious that defendant might be involved; she thus contacted the police. *See id.* at 271–72.

On May 21, 1991, defendant and her daughter Genesis left Minnesota and headed back to New Mexico by car. On May 23 the New Mexico police and the FBI stopped defendant's car in Albuquerque. *See id.* at 415. As the car was being pulled over, defendant instructed Genesis to hide the baby under a pillow. *See* VI R. at 638–39. However, the baby was discovered and defendant was placed under arrest for kidnapping. Defendant told an FBI agent: "I took the baby from the Las Cruces Hospital." *See* V R. at 485.

## II

### PROCEDURAL HISTORY

Defendant was indicted in the District of New Mexico on the kidnapping charge on June 4, 1991. However, she moved for transfer of the case, which was granted. The case was tried by the New Mexico federal judge in Topeka, Kansas.

Before trial, defendant gave notice pursuant to Rule 12.2(a) of the Federal Rules of Criminal Procedure of her intention to invoke an insanity defense.[1] The government

---

1. The federal insanity defense, governed by 18 U.S.C. § 17 (1988), was codified as part of the Insanity Defense Reform Act of 1984, Pub.L. No. 98–473, Title II, § 402(a), 98 Stat. 2057 § 20 (1984). The statute changed the pre-existing common law defense in two principal respects. First, the statute eliminated the volitional prong of the defense and thus "substantially narrow[ed] the [insanity] definition, which ha[d] evolved from case law...." S.Rep. No. 225, 98th Cong., 2d Sess. 222 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3404. Second, the statute shifted the burden to the defendant to prove the defense by clear and convincing evidence.

The insanity test previously followed by this court was that of the American Law Institute Model Penal Code. This court held that where the mental capacity of the accused was put in issue, the proper charge to the jury, in part, was that mental capacity was an essential element of the crime charged; that before convicting the

accused, the jury must be satisfied beyond a reasonable doubt not only that the accused committed the unlawful act, but that he was criminally responsible for his conduct; that a person is not criminally responsible for his conduct if, at the time of the conduct, "as a result of mental disease or defect, he lacked substantial capacity either to appreciate the wrongfulness of his conduct *or to conform his conduct to the requirements of the law.*" *Wion v. United States,* 325 F.2d 420, 430 (10th Cir.1963) (*en banc*) (emphasis added), *cert. denied,* 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309 (1964). The "volitional prong" was the latter portion of the insanity issue emphasized above, which was eliminated by § 17. The new statute provides:

§ 17. **Insanity defense**

(a) **Affirmative defense.**—It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant,

moved for a mental examination of defendant pursuant to Rule 12.2(c) and 18 U.S.C. § 4242 to determine her sanity at the time of the kidnapping. The court granted the motion and ordered a mental examination at the Federal Correctional Institution at Lexington, Kentucky. There a forensic evaluation report was prepared for the court in accordance with 18 U.S.C. § 4247(c) by Dr. Mary Alice Conroy, a psychiatric staff member at the institution. Defendant was also examined for the defense by Dr. Teresita McCarty, a private psychiatrist with experience in dissociative disorders such as MPD.

We detail the experts' views later. It is convenient now, however, to note these critical points about the experts' views. The government and defense experts were in agreement that one of the defendant's alter personalities, "Rina," perhaps with another alter personality, "Bridget," controlled defendant's conduct at the time of the kidnapping. The expert witnesses had varying views as to any conscious participation by defendant's host or dominant personality "Gidget" in preparations for or carrying out the kidnapping. *See* II R. at 20; VIII R. at 1008–20. However, the expert for the defense, Dr. McCarty, said she did not know whether the alters in control at the time of the abduction knew that taking a baby was wrong. *See* VIII R. at 1136–37. Solely because of the lack of evidence concerning the alters, the judge rejected the insanity defense and refused to submit instructions on it to the jury. *See* VIII R. at 1147–48, 1153.

After the judge rejected the defense and instructions on it, defense counsel stated that there was no need to attempt argument to the jury since her sole defense had been rejected. The trial judge said that argument on the defense would not be permitted. For this reason trial by jury was waived with the consent of the prosecution and defense counsel, and with the approval of the judge. The judge then made a finding that the defendant was guilty, *see* 18 U.S.C. § 4242(b)(1), and sentenced her to 63 months' imprisonment to

be followed by five years of supervised release, *see* IX R. at 1175. This timely appeal followed.

We turn first to the important evidence concerning the defendant's background, her mental condition, and the degree of its severity.

## III

### THE BACKGROUND OF DENNY-SHAFFER'S MENTAL CONDITION

The testimony of several percipient and expert witnesses at trial reveals the following facts concerning defendant's background and mental illness without significant dispute.

### A

#### *Defendant's Background*

Defendant was born in 1954 in Richfield, Minnesota, as the third of 10 children. Her parents divorced when she was 12. During childhood defendant experienced an array of severe physical and sexual abuse. Her mother, described by defendant's sister as "very moody," kicked and hit defendant and her siblings with her hands, belts, and hangers on all parts of their bodies. *See* V R. at 500–01. The mother once beat defendant black and blue all over her legs and back, sent her to school, and warned her not to tell anyone what had happened or she would be beaten again. *See* VI R. at 630. Several times, defendant received bloody noses from her mother's blows; on one occasion, she suffered a broken arm as a result of abuse. *See* VII R. at 871–72, 888. At least once, her mother burned defendant's lower legs in the bathtub. *See* VIII R. at 1045–46.

In addition to physically abusing her, defendant's mother tormented defendant concerning her eating habits and told her, at age four, that she could not have food at the dinner table because she was too fat. Conversely, one time after defendant had been throwing up, her mother told her to eat more

---

as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

(b) **Burden of proof.**—The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

18 U.S.C. § 17 (1988).

food. Defendant began binge eating at age seven, and in the eighth grade became anorexic. *See* VII R. at 884–85.

From about age four, defendant was subjected to sexual abuse by her older brother. *See* V R. at 513–14; VII R. at 866. According to defendant's sister Katy, who had herself been sexually abused by the brother, defendant was sexually abused by her brother as well. *See id.* The abuse continued until defendant was in junior high school. Beginning about that time, defendant also experienced several incidents of sexual abuse by one of her uncles. *See* VII R. at 566.

At age 14, while staying with her father in California, defendant was raped by one of her father's friends. Defendant told Dr. McCarty that as a result she became pregnant and had an abortion. *See* VII R. at 872. At age 16 defendant was also raped by her employer in California. *See id.;* VI R. at 609. At age 16 defendant met her first husband, Daniel Coffman. They were married and had two children together, Genesis and Shoshona. Mr. Coffman was abusive toward defendant and after five years of marriage, she divorced him. *See* V R. at 519.

Defendant and her daughters moved to Arkansas where she attended nursing school. In Arkansas, she met Peter Shaffer and they were married. While living in Arkansas, defendant suffered from long periods of severe depression and emotional instability. *See* V R. at 528–29; VI R. at 556, 566–67, 612, 619. From 1985 to 1989, while pursuing an advanced nursing degree, she received mental health treatment in the counseling program at the University of Arkansas. As part of the program defendant had a total of 98 individual therapy sessions. The counselors diagnosed her as suffering from a major depressive disorder and prescribed an antidepressant for her to take. *See* VII R. at 876–79.

In 1989 defendant moved to Bryan, Texas, where her husband Shaffer had grown up, but he never joined her there. Defendant's emotional condition worsened during her stay in Bryan and her daughters noticed a recurrence of bulimic behavior. *See* VI R. at 565–67, 626–27. While in Bryan, defendant struck up a romantic relationship with Jesse

Palomares which lasted about a year. She became pregnant by Palomares but the pregnancy ended in a miscarriage. *See* VI R. at 609–10, 627. The miscarriage left defendant more depressed than ever. She lay in bed for several days in a bathrobe soaked in blood and did not change her clothes or sheets. *See id.* at 610–11.

In early 1990 Palomares broke off his relationship with defendant. Soon thereafter, defendant entered a treatment program at the Cedars Hospital, complaining of stress, bulimia, and anorexia. *See* VII R. at 882–83, 886–87. She told her counselors about her childhood abuse and her sensation that she was observing herself, including her thoughts and feelings, from outside. Defendant was diagnosed as suffering from eating disorders and borderline personality disorder. *See id.* at 888–94, 899, 917.

Defendant transferred to Parkside Hospital where she was diagnosed with anorexia, bulimia, alcohol and chemical dependence, depression disorder, mood disorder, and moderately severe personality disruption. *See id.* at 894, 917. She was discharged after a 38–day stay. *See id.* at 895–96. While at Parkside, defendant lost her job. Her condition deteriorated and her mood swings intensified. *See* VI R. at 576, 590–91. On one occasion, she even failed to recognize one of her own daughters while talking to her at the house. The following day, defendant did not remember what had happened. *See id.* at 578–79.

In late 1990 defendant wrote in her diary that her life was "in Mai's hands" and that she was waiting to see "what Mai wants for me." *See* VIII R. at 948–52. She also made entries indicating that she thought she was pregnant and due in May 1991. At her father's funeral in Minnesota in December 1990, defendant told her family that she was pregnant. In January 1991 she experienced bleeding and believed she had a miscarriage. *See id.* at 961, 999.

The same month, defendant accepted a job as a nurse in the Women's Health Unit at Rehoboth Christian Medical Center in Gallup, New Mexico. The job was scheduled to begin February 4 and end May 6, 1991.

Defendant's diary indicates that she was concerned about leaving Palomares and was confused about their relationship: "I can't accept it's over, so I can't go on. I only want to let go if it's really over for him." *See id.* at 961. In block letters she wrote: "CONFUSED ME." *See id.* at 959. Defendant moved to Gallup to start her new job. She continued to pretend to her family that she was pregnant, and she wrote and talked to Palomares about her pregnancy, trying to convince him the baby was his and probably was a boy. *See* III R. at 126, 136; IV R. at 300.

While in Gallup defendant acquired a new social security card under the name Marina Bridget Kelly–Denny, plus two altered birth certificates, one indicating her mother was American Indian and the other indicating her father was Sioux. She also obtained a New Mexico driver's license under the name Marina Kelly. In March 1991 defendant had her picture taken, appearing pregnant. She told the photographer that she wanted to send the photo to the baby's father. *See* IV R. at 339, 341, 348.[2]

On May 8 defendant checked into a motel in Albuquerque. Two days later, she abducted Kevin Chavez from the Las Cruces Memorial Medical Center nursery.

### B

### *The Trial Evidence on Defendant's Mental Condition*

As noted, Dr. Conroy performed a court-ordered examination of defendant at the FCI in Lexington, Kentucky, and prepared a forensic evaluation which was admitted into evidence at trial. *See* II R. at 1–21; IX R. at 1169.[3] Dr. Conroy's report as the government's expert details much of the personal and medical history recounted above. Dr. Conroy diagnosed defendant as suffering from Multiple Personality Disorder (MPD), II R. at 19, as did the defense expert. Dr. Conroy stated:

> All factors taken together, the diagnostic picture presented by Bridget Denny–Shaffer is very consistent with a dissociative disorder known as Multiple Personality Disorder.... It involves the existence of two or more well integrated personality states within a single individual....
>
> In the case of Ms. Denny, the psychological disorder seems to have had its onset in early childhood. As is often the case, it may have developed as a defense against the physical, psychological, and/or sexual abuse which she endured.

II R. at 18. Moreover, Dr. Conroy discounted the possibility of malingering by the defendant. *Id.* at 17–18; *see also* the discussion of Dr. Foote's testimony in note 8, *infra.*

Dr. Conroy did not opine that defendant's host or dominant personality was in control at the time of the abduction of the infant.[4] Her report stated:

> It is essential to emphasize that someone suffering from a multiple personality disorder is still a single individual. Nonetheless, *it is important to examine which alter personality was in fact in control of the behavior during the instant offense. The defendant strongly emphasized the role of the irresponsible adolescent personality ["Rina"]. When accessed, this persona agrees she was searching for a baby and she took it from the hospital. Howev-*

---

**2.** According to Dr. McCarty, the witnesses who saw Denny–Shaffer at this photography session reported that her symptoms of pseudocyesis (false pregnancy) included not only a protruding stomach, but also swollen legs and ankles, blood-shot eyes, and difficulty walking and getting up from seated positions. To Dr. McCarty, that was consistent with psychologically induced pseudocyesis (an actual belief that one is pregnant, which can cause physical symptoms) as opposed to simply fastening a pillow to one's stomach to appear pregnant. *See* VIII R. at 1127.

**3.** Dr. Conroy is a member of the psychiatric staff at the Federal Correctional Institution in Lexing-

ton, Kentucky. We find no information in the record as to her academic degrees and experience, but no challenge is made to her qualifications to submit her opinion on the defendant's condition.

**4.** An MPD victim's "primary" or "host" personality is "the personality that has executive control of the body for the greatest percentage of time during a given time period." BENNETT G. BRAUN, TREATMENT OF MULTIPLE PERSONALITY DISORDER xiii (1986). An "alter" personality, on the other hand, is "any personality or fragment other than the host personality." *Id.*

er, she also refers to "Mother Superior" ("Bridget") as being present with her at the time. The most likely scenario from all data gathered seems to be the adolescent personality and the "Bridget" ("Mother Superior") personality are co-conscious and were co-conspirators in this offense.

II R. at 20˙ (emphasis added). Thus Dr. Conroy concluded that the alters Rina and Bridget were "present" at the time of the taking of the infant and that defendant's host or dominant personality was not present at the time of the abduction. There was some evidence in Dr. Conroy's report suggesting that the host personality may have been present at some points during the later trip. *See infra* Part VI(D).

The conclusion by the government expert that defendant's host or dominant personality was not present at the abduction of the baby was similar to that of defendant's expert, Dr. McCarty, who testified extensively at trial.[5] She concluded:

A. My conclusion was she was indeed suffering from a mental illness and the primary illness was multiple personality disorder.

. . . .

Q. Was she still suffering from it at the time you saw her?

A. Yes, she was.

Q. *And was she suffering from it before and on May 10th of 1991?*

A. *Yes, she was.*

. . . .

Q. Now, in Ms. Denny's case, who have you identified as the primary personality?

A. *It seems that Gidget is the primary personality.*

. . . .

Q. What are the names that you have identified of the other personalities?

A. There's Gidget, Bridget, Paul or Pal.... Then there was that part that I identified as a 14–year–old, because that's really all the information I got from her. And then Rina, ... who's also sometimes called M–A–R–I. Then there was a part called Mother Superior, and a part called Bird, and then there was a part that wasn't identified by a name, but by a description. It was female and little....

VII R. at 860; VIII R. at 972–73 (emphasis added). Dr. McCarty described the severity of defendant's mental illness as follows: "The illness was serious and severe." *Id.* at 1030. Dr. McCarty testified that in an MPD case, the primary personality is also sometimes called the host personality, that it is recognized by society as the person, and that it is the personality which interacts with the outside world and is identified "officially." *Id.* at 969–70. As to the personality in control at the time of the abduction, Dr. McCarty said:

Q. ... From your discussing this with the primary personality, *did the primary personality plan the abduction?*

A. *No.*

Q. *Did she know that there was going to be an abduction?*

A. *No.*

. . . .

Q. *Did she execute it?*

---

**5.** Dr. McCarty received her bachelor's degree in bacteriology and botany from Iowa State University. In 1981, she received an M.D. from the University of New Mexico. Her studies were concentrated in the area of general adult psychiatry. Following a one-year internship and a three-year psychiatry residency at the affiliated hospitals at UNM, Dr. McCarty worked at the V.A. Hospital in Albuquerque where she did outpatient psychiatry. She also taught as an assistant professor at UNM.

In 1986, Dr. McCarty became an attending psychiatrist at the Consultation Liaison Psychiatry Services at the University Hospital in Albuquerque. Since 1989, Dr. McCarty has been the Chief Psychiatrist for the Services. She is a

member of the American Psychiatric Association, the American Society for Child Abuse, the International Society for the Study of Multiple Personality and Dissociative Disorders, and Alpha Omega Alpha (a medical honor society). She has previously testified as an expert witness in one criminal trial, one sentencing hearing, and several commitment and custody hearings. *See* VII R. at 846–51.

The government objected to the admission of Dr. McCarty's testimony as an expert on the ground that she had insufficient experience in forensics. The judge overruled the objection and admitted her testimony as an expert. *See id.* at 856. No challenge is made to Dr. McCarty's qualifications on appeal.

A. *No.*

. . . .

Q. *Was Gidget capable of stopping this?*

A. *No.*

VIII R. at 1030–31 (emphasis added). Dr. McCarty testified that the defendant's primary personality, Gidget, does not control the other personalities. *Id.* at 987.

Dr. Conroy and Dr. McCarty thus agreed that, at the time of the kidnapping, defendant was suffering from MPD and that her dominant or host personality, "Gidget," did not consciously participate in the abduction.[6] Neither expert, however, could establish that the alter personality in control of defendant at the time of the offense was legally insane, *i.e.,* "unable to appreciate the nature and quality or the wrongfulness of [defendant's] acts." 18 U.S.C. § 17(a). The government expert, Dr. Conroy, believed that "[e]ach of the personalities taken alone knew, or was very capable of knowing, what she was doing and of making moral judgments." II R. at 21.

From these underlying conclusions, Dr. Conroy's report stated that there were two possible views on legal responsibility: (1) that in light of the presence of a host person-

---

**6.** Dr. Conroy's report stated that "Gidget" was unaware of the alters and first became aware of "Bridget" when "Bridget" spoke to the doctors in Albuquerque. *See* II R. at 13. However, Dr. Conroy also indicated that Denny–Shaffer had voluntarily given control to "Bridget" during much of the time she was in Gallup, New Mexico, and knew that "Bridget" was lying about being pregnant. *See id.* at 14, 20.

**7.** Dr. Conroy stated that

[a] final opinion of the criminal responsibility of Bridget Denny–Shaffer is a matter for the trier of fact to determine exactly how the standard will be applied in this case. In the application of the standard provided by law, a Multiple Personality Disorder is unique. If the standard is taken to mean that all alters, or at least the host personality, must be fully aware of the nature, quality, and wrongfulness of an act, then Bridget Denny–Shaffer was not responsible at the time of the instant offense. Such an application would probably mean that no one suffering from Multiple Personality Disorder could be held responsible for anything unless all alters were co-conscious at all times, regardless of their mental status otherwise. Such is almost never the case.

---

ality and several alter personalities, if the statute means that all alters, or at least the host personality, must be fully aware of the nature, quality, and wrongfulness of an act, then Denny–Shaffer was not responsible at the time of the abduction; and (2) on the other hand, if an MPD victim is viewed as a single individual with varying personality components, and not divided as separate people, the issue changes; in such a case the question would be whether the personality in control at the time of the offense was unable to understand the nature, quality, and wrongfulness of her acts. If this is the proper interpretation of the statute, then the defendant did suffer from a significant mental illness, but it was not such as to render her unable to understand the nature, quality, and wrongfulness of her acts.[7]

Dr. McCarty, on the other hand, was unable to render an opinion one way or another about the controlling alter or alters' being able to appreciate the nature and quality or wrongfulness of their conduct. *See* VIII R. at 1136–37.

The American Psychiatric Association defines MPD via two criteria:

> If, on the other hand, a Multiple Personality Disorder is viewed as a single individual with varying personality components and not divided as though he or she were a group of separate people, the issue changes. In such a case, the question would be whether, at the time of the instant offense, the personality in control suffered from a mental disease or defect such as to be unable to understand the nature, quality, and wrongfulness of their acts. If this is the appropriate application of the standard, then, in my professional opinion, at the time of the instant offense, Bridget Denny–Shaffer did suffer from a significant mental illness, but it was not such to render her unable to understand the nature, quality, and wrongfulness of her acts.

II R. at 21.

While legal conclusions by a government expert are proper under § 4242(a) and § 4247(c)(4)(B) for a report to the court regarding a defendant's responsibility at the time of an offense, under Rule 704(b) of the Federal Rules of Evidence (which was adopted as part of the Insanity Defense Reform Act) they are not proper for trial evidence purposes (i.e., for consideration by the jury). *See United States v. West,* 962 F.2d 1243, 1246–47 (7th Cir.1992) (*per* Will, J., with two judges specially concurring), *reh'g denied.*

A. The existence within the individual of two or more distinct personalities or personality states (each with its own relatively enduring pattern of perceiving, relating to and thinking about the environment and one's self).

B. Each of these personality states at some time, and recurrently, takes full control of the individual's behavior.

AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS § 300.14 (3d ed. rev. 1987) [hereinafter DSM–III–R]. Dr. McCarty noted that there are cases of MPD in which the alters are entirely separated with respect to memory, perceptions, emotions, and identity, so that no one personality knows about any of the others. *See* VIII R. at 968.[8]

## IV

### THE TRIAL JUDGE'S RULINGS

The trial judge held that the evidence was insufficient to raise the insanity defense, stating:

[W]e must look at the personality in control at the time of the act, and determine if that personality was able to understand the nature, quality, or wrongfulness of the act. . . .

. . . .

This record is void of any information or any testimony which would indicate whether the acting personality could or could not appreciate the nature and quality of the act or whether it was wrongful, and . . . the defendant has the burden of proving the defense of insanity by clear and convincing evidence.

. . . .

I feel that there is no testimony to support the submission of the [insanity defense] instruction under the view that I have taken concerning the application of the defense of insanity in this multiple personality context.

VIII R. at 1147–48, 1153.

The defendant argues that the stringent requirement imposed by the judge in these

---

**8.** In fact, the personalities can be so different that the differences may show up through physical symptoms. Dr. McCarty noted that different alters often require different eyeglass prescriptions. *See id.* at 1109. Different personalities may speak different languages, be different-handed, respond differently to physical tests such as electroencephalograms (EEGs) and Galvanic Skin Response tests, respond differently to medications, and score differently on psychological tests such as Rorschach tests and MMPIs (Minnesota Multiphasic Personality Inventories). *See* Elyn R. Saks, *Multiple Personality Disorder and Criminal Responsibility*, 25 U.C.DAVIS L.REV. 383, 396–97 & nn. 44–45 (1992) [hereinafter Saks].

Denny–Shaffer exhibited many of these characteristics, as well as others which are consistent with complete dissociation into separate personalities. For example, when tested at Cedars Hospital in July of 1990, she exhibited a full-scale IQ score of 103, but when tested by Dr. Conroy in September of 1991 her full-scale IQ score was 122, an almost twenty percent increase. *See* VII R. at 750–51. Dr. Foote, Denny–Shaffer's examining psychologist, testified that such a large and statistically significant change in full-scale IQ scores suggested a change in Denny–Shaffer's cognitive functioning between the two test administrations. *See id.* at 750–54. Denny–Shaffer's variable cognitive abilities were confirmed by another witness, Erile Sue Casey, who had tutored her in algebra and geometry at the Bernalillo County Detention Center. *See* VI R. at 675. Ms. Casey testified that Denny–Shaffer on occasions seemed to forget concepts in the mid-

dle of tutoring sessions, while on other occasions she would make leaps in problem-solving ability that astounded Ms. Casey. *See id.* at 677–79.

Denny–Shaffer also produced results on the Rorschach and MMPI tests which were indicative of MPD. For example, her Rorschach test results indicated what Dr. Foote referred to as "a kind of psychological duality," indicating the presence of more than one personality in the same body on several different occasions. *See* VII R. at 764–66. Denny–Shaffer took five MMPI tests that Dr. Foote was aware of. They showed fairly drastic changes over time. *See id.* at 792–802. Moreover, Dr. Conroy was apparently able to administer the test separately to the Gidget host and the Bridget alter. *See id.* at 802–03. The latter two tests indicated strong differences between the two personalities, most notably strong depression showings for Gidget as compared to little or no depression demonstrated by Bridget. *See id.* at 802–05. Dr. Foote further testified that he felt it was impossible to fake both an MMPI and a Rorschach test administered closely in time to each other, and that Denny–Shaffer's test results had other indicia of reliability apart from the internal MMPI anti-malingering features. *See id.* at 810–12. On the relatively low incidence of malingering and fakery in psychological profiling tests, and their resistance to such attempts at fakery, *see* Michael L. Perlin, *Unpacking the Myths: The Symbolism Mythology of Insanity Defense Jurisprudence*, 40 CASE W.RES.L.REV. 599, 714–16 & nn. 556–560 (1990).

circumstances was error. She maintains that when the evidence, as here, sufficiently demonstrates that the defendant is suffering from a multiple personality disorder and that there is an identified host or dominant personality, and that this personality was not conscious of the planning or carrying out of the wrongful conduct, then a sufficient showing has been made to require submission of the defense to the trier of fact under 18 U.S.C. § 17. *See* Appellant's Brief-in-Chief at 44–50. The government, on the other hand, supports the restrictive view of the evidence adopted by the trial judge, arguing that only evidence as to the mental state of the alter personality or personalities in control at the time of a wrongful act is relevant. Brief of Appellee at 18–20.

## V

### AVAILABILITY OF THE INSANITY ISSUE FOR APPEAL

■ Before we turn to the insanity issue we will deal with the government's claim, made for the first time in this Court, that Denny–Shaffer waived her right to appeal the district court's denial of an instruction on her insanity defense. Noting that after the judge rejected her insanity defense, she elected to waive trial by jury and have her guilt or innocence determined by the judge, the government claims that she thus waived all claims of error "peculiar to a jury trial." *See* Brief of Appellee at 25.

The government argues that the issue is: "Whether a defendant, convicted in a bench trial, can raise an issue concerning the failure to give an instruction." Brief of Appellee at 1. This formulation is flawed, as it fails to recognize the underlying substance and extent of the trial judge's rulings. While the judge did refuse any instructions to the jury on the insanity defense, he did so because he first ruled that due to insufficiency of evidence, the possibility of a verdict or a court finding of "not guilty only by reason of insanity," 18 U.S.C. § 4242(b), was "out." IX R. at 1172–73. The judge himself as trier of the facts refused to consider the defense,[9] in

addition to denying any instruction to the jury on insanity. These actions by the judge are appealable in our judgment, and the issue whether the insanity defense was sufficiently raised by the evidence was not waived.

We reject the government's waiver argument for several reasons. First, this waiver contention was not made in the district court at any time. At the close of the hearing, when the district judge announced his views on the insanity defense, he referred to the appeal to this court which was reasonably certain to follow. *See* IX R. at 1172–73. Defendant elected to waive trial by jury only *after* the district court had made its legal ruling that the evidence on the insanity defense was insufficient to present a submissible defense. Thus the circumstances do not support an inference of an intent to waive this key issue.

Defense counsel confirmed that she had rested her case after announcement of the judge's ruling. Then the judge and counsel discussed the issues for the fact finder as guilty, not guilty, or not guilty by reason of insanity. *See id.* at 1150. Rejecting that formulation of the issues, the court flatly stated that the issue of not guilty by reason of insanity was "out," saying that the defense was no longer an option for the jury or the court if it was to be the finder of fact. *See id.; see also* IX R. at 1172 ("it won't be a defense in this case").

After this pronouncement by the judge, defense counsel stated that it did not make sense to present any argument on insanity—it would have been pointless because she would not have been allowed to argue it to the jury. *See* VIII R. at 1150. The court responded: *"No, you can't. I wouldn't permit you to." Id.* at 1151 (emphasis added). Only then did defense counsel say that the "thing to do is to waive the jury." *Id.* However, defense counsel clearly stated that she opposed the underlying ruling, and her objection was noted by the court, which said "[s]urely." *Id.*

---

**9.** The record shows no withdrawal by the defendant of the insanity defense from the judge's

consideration when he decided on his verdict under 18 U.S.C. § 4242(b).

The district judge's comments show his recognition of defendant's reservation of her right to appeal his ruling:

> *I will find that defendant has waived her right to a jury trial solely because of the court's ruling,* and that in order to be entitled to instruction on the affirmative defense of insanity she needs to present evidence that the acting alter was unable to appreciate the nature and quality or wrongfulness of her actions. *I will find that the waiver of defendant's right to a jury trial operates for this proceeding only; that is, this trial, and that if there is a retrial, her right to a jury trial is not waived for that retrial or further trial. I will find further that the decision which I will make in connection with guilt or innocence is not made in reliance on any evidence which related to the defendant's claimed insanity at the time of the offense.*

IX R. at 1160–61 (emphasis added). The government stated no objection or claim of waiver by defendant's waiver of jury trial as the posture of the case was shaped for defendant's appeal.

The trial judge explained to the jury the essence of his ruling—that the insanity defense was one which could be taken advantage of only by the personality in control at the time the baby was taken. *See* IX R. at 1172. The judge said he had advised counsel that the insanity defense would not be submitted: "[I]t won't be a defense in this case, and [so] counsel ha[ve] decided to go forward with the case without the jury." *Id.* Arguments were waived and the court announced that it found Denny–Shaffer guilty. *See id.* at 1175.

Thus the district judge did not merely reject one or more proposed jury instructions on the insanity defense. Rather, he rejected the insanity defense as not being available to defendant at all. *See United States v. Whitehead,* 896 F.2d 432, 435 (9th Cir.) (affirming a district court's refusal to instruct the jury on the insanity defense because the evidence adduced could not have established "with convincing clarity" that the defense was applicable), *cert. denied,* 498 U.S. 938, 111 S.Ct. 342, 112 L.Ed.2d 306 (1990). Defense counsel specifically objected to the rejection of the insanity defense, stating that there was sufficient evidence to go to the jury on the insanity issues proposed by the defendant's requested instructions. IX R. at 1168.[10]

It has been held that jury trial waivers do not operate to waive appellate review of certain underlying claims of error. For example, in *Government of Canal Zone v. Davis,* 592 F.2d 887 (5th Cir.1979), the defendants had feared that the jury composition was suspect. They thus moved to inspect the records kept by the court clerk that related to the selection and composition of the jury. When the district court denied that motion, the defendants elected to waive jury trial and be tried by the court on stipulated facts. The government argued that the waiver of jury trial operated as an abandonment of their right to challenge the error on appeal. The Fifth Circuit disagreed, finding that rather than waiving jury trial *per se,* the defendants had instead waived "a trial by a jury of suspect composition." *See* 592 F.2d at 889. In the instant case, one might say that rather than waiving her right to a jury trial *per se,* Denny–Shaffer merely waived trial by a jury which was to be prevented by the court from considering her only defense.[11]

---

**10.** Denny–Shaffer waived her right to jury trial in anticipation of appealing the court's underlying ruling. The defendant in *Ostrosky v. State,* 704 P.2d 786 (Alaska Ct.App.1985), followed a similar procedure. He had requested a jury instruction and an opportunity to present testimony on the defense of reasonable reliance on a judicial decision; the trial judge refused to give the instruction and ruled the defense inapplicable as a matter of law. The defendant then waived his right to a jury trial on the express condition that he be permitted to appeal the judge's underlying rulings. *See id.* at 789. The appellate court found that the issue had been properly raised.

As in *Ostrosky,* Denny–Shaffer's issue here was in fact "presented to, considered [and] decided by the trial court." *Lyons v. Jefferson State Bank & Trust,* 994 F.2d 716, 721 (10th Cir.1993) (internal quotes omitted). Denny–Shaffer also clearly pursued the issue below. *See id.* at 722. The fact that the trial court recognized the impending appeal is probative of the effective preservation of the insanity issue. *See id.* at 723.

**11.** When a case is tried to the court without a jury (no matter when that election is made), all

In sum, as the trial judge below clearly recognized, defendant's procedure in no way amounted to a waiver of her right to appeal and argue that a submissible insanity defense was presented in accord with 18 U.S.C. § 17(a). The issue was not waived and will be considered on its merits.

## VI

### THE INSANITY DEFENSE

#### A

#### *The Background of the Defense*

■ Our criminal justice system punishes those it convicts for many reasons, chief among them being retribution against the criminal, deterrence of future crimes, and rehabilitation of the criminal. *See Kelly v. Robinson*, 479 U.S. 36, 49, 107 S.Ct. 353, 361, 93 L.Ed.2d 216 (1986). However, we hold accountable only those who are morally culpable for their conduct; historically we have not held "the very crazy" morally accountable for at least some of their actions. *See* Peter Arenella, *Convicting the Morally Blameless: Reassessing the Relationship Between Legal and Moral Accountability*, 39 UCLA L.Rev. 1511, 1521 (1992); Stephen J. Morse, *Excusing the Crazy: The Insanity Defense Reconsidered*, 58 S.Cal.L.Rev. 777, 781 (1985) [hereinafter Morse]. In principle, the insanity defense can be traced back through at least 1,000 years of British law, and perhaps back as far as Roman, Christian, and Judaic law. *See* Ira Mickenberg, *A Pleasant Surprise: The Guilty But Mentally Ill Verdict Has Both Succeeded in Its Own Right and Successfully Preserved the Traditional Role of the Insanity Defense*, 55 U.Cin.L.Rev. 943, 953–54 (1987); Morse, 58 S.Cal.L.Rev. at 781 & n. 5. .

The point to be gleaned from this discussion is simple: Whatever the specific formulation of the defense has been throughout history, it has always been the case that the law has been loath to assign criminal responsibility to an actor who was unable, at the time he or she committed the crime, to know either what was being done or that it was wrong. This basic tenet has apparently been entirely unaffected by advances in medicine or psychology. *See* Michael L. Perlin, *Unpacking the Myths: The Symbolism Mythology of Insanity Defense Jurisprudence*, 40 CASE W.RES.L.REV. 599, 658–66 (1990) [hereinafter Perlin]. As the first Justice Harlan noted nearly one hundred years ago, while one of the goals of the criminal justice system is to punish criminals and protect public safety, some "crimes of the most atrocious character" must not be the subject of criminal sanctions if the imposition of such sanctions would require the courts "to depart from principles fundamental in criminal law, and the recognition and enforcement of which are demanded by every consideration of humanity and justice." *Davis v. United States*, 160 U.S. 469, 493, 16 S.Ct. 353, 360, 40 L.Ed. 499 (1895).

#### B

#### *MPD, Denny–Shaffer, and § 17(a)*

■ The district court rejected the insanity defense as not submissible to the jury because "[t]his record is void of any information or any testimony which would indicate whether the acting [alter] personality could or could not appreciate the nature and quality of the act or whether it was wrongful." VIII R. at 1147–48, 1150. The judge thus limited consideration of the evidence to that dealing with the alter or alters acting at the time of the offense, requiring proof as to that alter or alters to satisfy the statute, and denying consideration of the evidence dealing with the dominant or host personality of the defendant to satisfy the insanity defense statute as the judge construed it.

■ The defendant argues that the judge erred in his ruling construing § 17. She maintains that the proof was sufficient to raise a submissible insanity defense with a

errors of law made during the trial which were objected to and properly preserved for appeal are open for consideration by the appellate courts. *See Boardman v. Toffey*, 117 U.S. 271, 272, 6 S.Ct. 734, 734, 29 L.Ed. 898 (1886); *Tyng v. Grinnell*, 92 U.S. (2 Otto) 467, 469, 23 L.Ed. 733 (1876); *Cooper v.* *Omohundro*, 86 U.S. (19 Wall.) 65, 68–69, 22 L.Ed. 47 (1874); *Insurance Company v. Folsom*, 85 U.S. (18 Wall.) 237, 248–49, 21 L.Ed. 827 (1874); *Dickinson v. The Planters' Bank*, 83 U.S. (16 Wall.) 250, 258, 21 L.Ed. 278 (1873) (questions of law reviewable).

reasonable and proper interpretation of the Act. We agree. We are convinced that the proof was sufficient, given reasonable and proper interpretation of the statute, for the trier of fact to find that the defendant had shown by clear and convincing evidence that, as a result of a severe mental disease or defect, she was not guilty by reason of insanity since her dominant or host personality was neither aware of nor in control of the commission of the offense and thus was unable to appreciate the nature and quality or wrongfulness of the conduct which the alter or alters carried out. As noted, Dr. McCarty testified that in Denny–Shaffer's case, "[t]he illness was serious and severe." VIII R. at 1030.[12]

■ Nothing in the language of the statute itself provides a clear guide to its application here.[13] Nor is there anything in the legislative history we have indicating the answer to our question. Indeed, there is no mention of MPD or dissociative disorders in that history.[14] This is not surprising, considering the fact that Congress appeared to be primarily concerned with shifting and increasing the burden of proof in insanity defense cases, as well as eliminating the volitional prong of the defense in order to avoid its unwarranted application in some cases,

**12.** Such testimony on the severity of the mental illness is not violative of Rule 704 of the Federal Rules of Evidence. *See United States v. Kristiansen,* 901 F.2d 1463, 1466 (8th Cir.1990).

**13.** This court has reviewed convictions where an insanity defense was asserted under 18 U.S.C. § 17 in *United States v. Holsey,* 995 F.2d 960 (10th Cir.1993), and in *United States v. Eagan,* 965 F.2d 887 (10th Cir.1992). However, no issue similar to that raised here was involved in those cases.

**14.** In Senate Report No. 98–225, we find references to paranoid schizophrenia and schizophrenia, inadequate personality, and abnormal personality, but no reference to MPD or any other dissociative disorder. *See* S.Rep. No. 255, 98th Cong., 2d Sess. 222–23 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3404–05. We have examined the hearings before the Subcommittee on Criminal law of the Senate Committee on the Judiciary, as well as before the full committee, in which different proposals were considered for limiting the insanity defense. *See Limiting the Insanity Defense: Hearings on S. 818, S. 1106, S. 1558, S. 1995, S. 2572, S. 2658, and S. 2669 Before the Subcomm. on Criminal Law of the Senate Comm. on the Judiciary,* 97th Cong., 2d Sess. (1982) [hereinafter *Limiting the Insanity Defense*]; *The Insanity Defense: Hearings on S. 818, S. 1106, S. 1558, S. 2669, S. 2672, S. 2678, S. 2745, and S. 2780 Before the Senate Comm. on the Judiciary,* 97th Cong., 2d. Sess. (1982) [hereinafter *The Insanity Defense*].

In these hearings, MPD was not mentioned. *See, e.g., Limiting the Insanity Defense* at 158 (schizophrenia and psychosis) (Senator Specter); *id.* at 184 (same) (article, Willard Gaulin, *Legal Insanity: Gone Bonkers,* Washington Post, June 20, 1982); *id.* at 186 (schizophrenia and "incoherent thinking") (article, Garland Y. DeNelsky, *How Psychiatry Can Aid Courts,* New York Times, June 1982); *id.* at 199 (schizophrenia) (Senator Specter); *id.* at 221 (process schizophrenia, major effective disorders, pseudo-neurotic schizophrenia, pathological ambivalence, paradoxical rage, paranoid personality disorder, borderline personality disorder) (Senator Specter); *id.* at 225 (claim by witness that most patients in his facility found not guilty by reason of insanity were schizophrenic) (statement of Dr. James L. Cavanaugh, Clinical Director, Section on Psychiatry and the Law, Department of Psychiatry, Rush–Presbyterian–St. Luke's Medical Center, Chicago, Illinois); *id.* at 253 (schizophrenia) (statement of Dr. Alan Stone, Professor of Law and Psychiatry, Harvard University, Chairman of the American Psychiatric Association Council of Government Policy and Law); *id.* at 257 (catatonic schizophrenia) (statement of Dr. Loren Roth, director of law and psychiatry, Western Psychiatric Institute and Clinic, University of Pittsburgh); *id.* at 381 (schizophrenias, personality disorders, retardation) (statement of Dr. Stuart B. Silver, superintendent, Perkins Hospital and assistant secretary for forensic services, State of Maryland); *id.* at 389–93 (schizophrenia and psychosis) (Stanley I. Gochman, Ph.D., *Psychological Issues & the Insanity Defense: Legal, Moral & Psychological Considerations*); *The Insanity Defense* at 29 (inadequate personality, abnormal personality, schizophrenia) (statement of Hon. William French Smith, United States Attorney General); *id.* at 146 (discussing DSM–III classification of mental disorders and mentioning psychogenic fugue, which is related to MPD, but never mentioning MPD *per se*) (attachment to statement of Frank Maloney, attorney, member of Board of Directors of National Association of Criminal Defense Lawyers). *But see Limiting the Insanity Defense* at 158 (in which Senator Specter and Mr. Woodrow Johnson, member of the jury in *United States v. Hinckley,* appeared to equate schizophrenia with "split" or "mixed" personality).

The fact that MPD is nowhere mentioned is not fatal to § 17(a)'s application to an MPD victim, for courts have "never required that every permissible application of a statute be referred to in its legislative history." *Moskal v. United States,*

unlike this one, in which the available expert witnesses disagreed as to the defendant's mental condition. *See* S.Rep. No. 255, 98th Cong., 2d Sess. 222–23 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3404–05.

■ We are convinced that the trial court's interpretation of § 17 is unreasonable in restricting the focus of the court and jury narrowly to the alter or alters cognizant of the offense, and ignoring proof that the dominant or host personality was not aware of the wrongful conduct. We are instructed that such "[l]iteral interpretation of statutes at the expense of the reason of the law and producing absurd consequences or flagrant injustice has frequently been condemned." *Sorrells v. United States*, 287 U.S. 435, 446, 53 S.Ct. 210, 214, 77 L.Ed. 413 (1932). The Court continued:

> "All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter."

*Id.* at 447, 53 S.Ct. at 214 (quoting *United States v. Kirby*, 74 U.S. (7 Wall.) 482, 486, 19 L.Ed. 278 (1869)). It has long been recognized that "absurd results are to be avoided." *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981); *see also United States v. American Trucking Associations*, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940); *United States v. Ryan*, 284 U.S. 167, 175, 52 S.Ct. 65, 68, 76 L.Ed. 224 (1931); *Resolution Trust Corporation v. Westgate Partners, Ltd.*, 937 F.2d 526, 531 (10th Cir.1991). In *Ryan* the Court stated that

> [a] literal application of a statute which would lead to absurd consequences is to be avoided whenever a reasonable application can be given which is consistent with the legislative purpose.

284 U.S. at 175, 52 S.Ct. at 68.

Here there was substantial evidence presented by the defendant that the defendant's host or dominant personality was unaware there was to be an abduction by an alter personality and was not capable of preventing it. VIII R. 1030–31. Thus not only was the host personality unable to appreciate the nature of the abduction, she did not even grasp that it was being committed. Yet the government would have us hold that, because one or more of the alter personalities knew what was happening and the experts are unable to say that those personalities could not appreciate the nature and quality or wrongfulness of the acts, the defense is wholly unavailable to Denny–Shaffer.

We find no support for such a restrictive interpretation in the wording of § 17 or in the legislative history. We should not make a guess in such circumstances on the construction of the statute, *see Bifulco v. United States*, 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980), since "probability is not a guide which a court, in construing a penal statute, can safely take," *United States v. Wiltenberger*, 18 U.S. (5 Wheat.) 76, 105, 5 L.Ed. 37 (1820).

■ Our conclusion is further supported by the principle that penal statutes are to be strictly construed against the government. *See Huddleston v. United States*, 415 U.S. 814, 831, 94 S.Ct. 1262, 1272, 39 L.Ed.2d 782 (1974). Laws which expressly define or limit punishment are considered penal. *See* 3 Norman J. Singer, Sutherland Statutory Construction § 59.02, at 96 (5th ed. 1992) [hereinafter Sutherland]. The principle is based on the idea that "before a person can be punished his case must be plainly and unmistakably within the statute." *Id.* § 59.03, at 105. A statute which grants to defendants an affirmative defense is simply the logical flip side of a statute which defines criminal conduct. By defining instances in which conduct that has otherwise been defined as criminal will not be punished, such a statute in effect defines when that conduct *will* be punished. Therefore, before a defendant should be denied the benefit of an affirmative defense provided by statute, his case must be plainly beyond that statute's reach. The insanity defense provided by § 17 is an affirmative defense "to a prosecution under any Federal statute," and we

should apply the principle of construction favoring the defendant in applying it.

This principle is not new. In *Waters v. United States*, 328 F.2d 739, 742 (10th Cir. 1964), this court reviewed a conviction under the Internal Revenue Code and was required to construe the statutes of limitations, including a general three-year limitation. This statute, which was more favorable to the accused, was held to apply. In choosing that statute this court stated that "[the limitation] is to be liberally interpreted in favor of the accused." *Id.* at 742; *see also State of Connecticut v. Paradise*, 189 Conn. 346, 456 A.2d 305, 308–09 (1983) ("statutes of limitation in criminal cases are to be construed liberally in favor of the accused"); 3 SUTHERLAND § 59.-02, at 96–97, 102 (enumerating statutes defining or limiting punishment and classifying statutes of limitations for prosecutions as penal and subject to strict construction).

We are persuaded that in light of the longstanding rules of construction we have noted, the trial court's interpretation of § 17 was error. Instead of interpreting the statute to limit consideration of the evidence to that concerning a particular alter's mental state at the time of the offense, the statute should have been construed to permit consideration of the evidence showing the lack of participation, awareness, or control of the offense conduct by the host or dominant personality.

It is instructive to consider what the members of the Senate Subcommittee on Criminal Law were trying to do when the bills which were the precursors of § 17 were under consideration. As Senator Specter, the subcommittee's chairman, put it, they were attempting to determine whether the then-current legal test of insanity "ma[de] sense in psychiatric terms and in legal terms," *see Limiting the Insanity Defense* at 221 (Senator Specter), and to insure that "when we try to protect society from acts of violence [we]

have an appropriate balance for the rights of individuals, and for those who are really insane," *id.* at 241. The subcommittee clearly felt that the government has an obligation to treat rather than punish the mentally ill. *See id.* at 36 (statement of Senator Hatch).

In attempting to come to grips with what the standard for exonerating a defendant should be, the subcommittee discussed several cases in which defendants had in fact been found not guilty by reason of insanity. *See id.* at 242–50.[15] In discussing those cases, Senator Spécter noted that if a mental disease "*eliminated [the defendant's] knowing of the intentional act, then I would agree that, by civilized standards, [the defendant] should not be responsible.*" *Id.* at 246 (emphasis added). This discussion occurred before what was to become § 17 was drafted. Nevertheless it indicates to us that the drafters felt that, whatever the wording of the statutory definition of the defense actually turned out to be, it would be applicable to defendants rendered actually unable to know about their actions as a result of a mental disease or disorder.

We must remember that the issue on appeal is only the narrow one of whether the evidence before the trial judge was sufficient to raise an insanity defense.[16] The Eleventh Circuit stated the test under § 17, with which we agree, in *United States v. Owens*, 854 F.2d 432 (11th Cir.1988), where an instruction was held to be required:

> We hold that, where the issue of insanity has otherwise been properly raised, a federal criminal defendant is due a jury instruction on insanity when the evidence would allow a reasonable jury to find that insanity has been shown with convincing clarity. *Recalling the jury's right to determine credibility, to weigh the evidence, and to draw justifiable inferences of fact, the trial judge must construe the evidence*

498 U.S. 103, 111, 111 S.Ct. 461, 467, 112 L.Ed.2d 449 (1990).

**15.** The participants in this discussion were: Senators Specter and Heflin; Dr. James L. Cavanaugh, Clinical Director, Section on Psychiatry and the Law, Department of Psychiatry, Rush–Presbyterian–St. Luke's Medical Center, Chicago, Illinois; Dr. Ernst Prelinger, Clinical Professor

of Psychology and Psychiatry, Yale University; and Dr. Jonas P. Rappeport, Chief Medical Officer, Supreme Bench of Maryland.

**16.** The sufficiency of the evidence for submission of a mental condition issue is a question of law for the court. *See United States v. Dennison*, 937 F.2d 559 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 886, 116 L.Ed.2d 789 (1992).

*most favorably to the defendant. The court also needs to remember that, although the "clear and convincing" standard is a fairly high one, "clear and convincing" does not call for the highest levels of proof. If evidence would permit the jury to find to a high probability that defendant was insane, an insanity instruction is required.*

854 F.2d at 435–36 (footnotes omitted) (emphasis added); *see also United States v. Whitehead,* 896 F.2d 432, 435 (9th Cir.), *cert. denied,* 498 U.S. 938, 111 S.Ct. 342, 112 L.Ed.2d 306 (1990) (adopting the *Owens* test). If the evidence raises a defense, under the general rule it is for the jury, and not the judge, to determine whether a given psychiatric diagnosis, if accepted, brings the accused within the legal definition of insanity. *See Taylor v. United States,* 222 F.2d 398, 404 (D.C.Cir.1955); *Stewart v. United States,* 214 F.2d 879, 882 (D.C.Cir.1954). In determining whether error was committed in rejecting the defense and refusing to instruct on it under 18 U.S.C. § 17, our review is *de novo. Whitehead,* 896 F.2d at 435.

Here there is evidence for the defendant plainly sufficient to support inferences by the trier of fact that Denny–Shaffer suffers from a severe mental defect or disease [MPD]; that at the time of the abduction,[17] her dominant or host personality was not in control so as to cause commission of the offense, and was not aware that an alter personality or personalities were the cognizant parties controlling the physical actions; that as a result of defendant's severe mental disease or defect, the host or dominant personality was unable to appreciate the nature and quality or wrongfulness of the conduct which the alter or alters controlled; and that defendant had proven these facts by clear and convincing evidence.

 We hold that under the test stated in *Owens,* the evidence presented here was thus sufficient to call for the submission of the insanity defense to the trier of fact, given the reasonable application of § 17 under the rules of construction that apply.[18] In construing the statute, we note again that its purposes were principally to shift to the defense the burden of proof on insanity and to increase that burden, and to eliminate the volitional prong of the defense.[19] It is apparent from the face of the statute that it was not intended to eliminate the insanity defense, but rather to limit it to persons whose perceptions, rather than their volitions, were impaired by severe mental disease or defect. MPD is such a disease or defect and both the historical purposes of the insanity defense, as well as the objectives of the Insanity Defense Reform Act, can be vindicated by construing "defendant" in § 17(a) to permit consideration of evidence concerning the host or dominant personality and his or her appreciation of the nature, quality, and wrongfulness of criminal conduct. The rulings of the trial judge in this case in effect struck all the evidence showing that Denny–Shaffer's host or dominant personality was not cognizant of the wrongful conduct of the alter or alters and thus did not "appreciate the nature and quality or wrongfulness" of her acts within the meaning of § 17; the rulings were in error. *Accord People v. Lisnow,* 88 Cal.

---

**17.** In Part VI(D), *infra,* we discuss the possible criminal responsibility for the defendant's conduct subsequent to the abduction.

**18.** We do *not* hold that a factual showing or jury finding that a defendant suffers from MPD, without more, automatically satisfies § 17's requirements. Instead we hold that where the evidence would permit a jury to find that a defendant suffers from MPD and that the host personality was unaware of the criminal conduct at issue and did not participate in or plan that conduct, the jury may also find that the "defendant" satisfied § 17's requirements and thus return a verdict of "not guilty only by reason of insanity" pursuant to § 4242(b)(3). *Accord United States v. Cameron,* 907 F.2d 1051, 1060 n. 14 (11th

Cir.1990) (mere diagnosis of defendant as schizophrenic at some past times does not necessarily imply that the defendant was *legally insane* at the relevant times, but a proffer of such evidence required a more probing inquiry into the defendant's mental state).

**19.** Congress chose to eliminate the volitional prong of the insanity defense because of virtually unanimous agreement amongst practitioners that there was no scientifically valid way of assessing volitional impairment. *See* S.Rep. No. 225, 98th Cong., 2d Sess. 226–29, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3408–11. However, no such problems were reported with the perceptual prong of the defense. *See* sources cited *supra* note 2.

App.3d Supp. 21, 151 Cal.Rptr. 621 (1978) (error to strike evidence of fugue or dissociative state produced by traumatic neurosis tending to prove defense of unconsciousness).

Therefore, we are convinced that it was error for the statute to be construed to restrict consideration of the evidence to that pertaining to the alter or alters that planned and carried out the abduction, and to reject as a matter of law consideration of the evidence that the host or dominant personality was unaware of the wrongful conduct here.[20]

## C

### Related Case Law on MPD

Decisions regarding proper construction of insanity defense statutes where MPD was involved are not numerous. We have been unable to find any federal case where such a defense involving MPD was asserted under § 17. Moreover, the state cases involving this mental disorder are few in number and of limited assistance because of the variance in the nature of the insanity defenses in the states.

The government relies on *State of Ohio v. Grimsley,* 3 Ohio App.3d 265, 444 N.E.2d 1071 (1982), and its progeny. There the argument was made that the defendant's MPD state was such that she was not acting consciously or voluntarily at the time of the offense of driving under the influence of alcohol and could not be guilty. The court held that the defense failed. The claim that the defendant was dissociated from her primary to a secondary personality and thus was not acting consciously or voluntarily was rejected as not supported by the evidence. Without analysis, the court said there was only one person driving and one person accused of drunken driving and that the "evidence failed to demonstrate that Jennifer [the alter] was unconscious or otherwise acting involuntarily." 444 N.E.2d at 1075–76.

The Georgia Court of Appeals relied on the *Grimsley* decision in *Kirkland v. State of Georgia,* 166 Ga.App. 478, 304 S.E.2d 561 (1983). There an insanity defense was premised on a multiple personality disorder which the trial judge found to have been properly diagnosed as psychogenic fugue. The judge rejected the insanity defense and found the defendant "guilty but mentally ill" under a provision in Georgia law for such a finding.

On appeal, Kirkland argued that the trial judge's ruling was contrary to the evidence and the law and that it was error not to find her "not guilty by reason of insanity." The Georgia Court of Appeals followed the reasoning of the *Grimsley* opinion that there "was only one person driving the car and only one person accused of drunken driving." The Georgia court noted that this ruling in *Grimsley* was made "without elaboration" but then likewise concluded that the "law adjudges criminal liability of the person according to the person's state of mind at the time of the act; we will not begin to parcel criminal accountability out among the various inhabitants of the mind." 304 S.E.2d at 564. Without further elaboration itself, the *Kirkland* opinion rejected the defense raised there on the MPD evidence.

*Kirby v. State of Georgia,* 201 Ga.App. 116, 410 S.E.2d 333 (1991), was similar to *Kirkland.* The defendant argued that rejection of his insanity defense based on a multiple personality disorder was error. Without further analysis, the Georgia court followed its earlier *Kirkland* ruling and quoted the *Kirkland* analysis we have noted above.

We are not persuaded by these cases. We find no convincing analysis in *Grimsley, Kirkland,* or *Kirby* which would justify rejection of an insanity defense as not submissible under § 17 for the trier of fact when evidence as strong as that in Denny–Shaffer's case on her mental disorder is presented.

The government also relies on *State of Hawaii v. Rodrigues,* 67 Haw. 70, 679 P.2d 615, *cert. denied and appeal dismissed,* 469 U.S. 1078, 105 S.Ct. 580, 83 L.Ed.2d 691 (1984). There the state appealed the grant

---

**20.** We have discussed mainly the host personality's awareness and conduct at the time of the abduction because that was the focus of the trial judge in making his critical ruling rejecting the insanity defense. We must, however, consider other aspects of the host personality's awareness and conduct during the period between the abduction and the arrest because of the continuing nature of the kidnapping offense charged under 18 U.S.C. § 1201. *See infra* Part VI(D).

of an acquittal by the trial judge on a pretrial motion to determine competence at the time of the offense. The insanity defense was asserted on the basis of MPD. The court summed up the expert testimony as showing that the defendant had one to three personalities; that personality A could appreciate the wrongfulness of his acts and conform his conduct to the requirements of the law, but could not control B; B could understand the wrongfulness of his conduct but could or could not (depending on whose testimony was more persuasive) control his behavior in accord with the requirements of the law; and C did not care about whether his acts were right or wrong, or care about the consequences of his conduct. *See* 679 P.2d at 620.

The Hawaii court held that the judge erred in granting the pretrial acquittal without giving the matter to the jury. *Id.* The court held that the question of sanity at the time of the offense and the corresponding question of which personality was present at the time of the offense were questions properly for the trier of fact. *Id.* The statement of the court relied on by the government was that "[r]ecent cases dealing with the multiple personality defense have held it is immaterial whether the defendant was in one state of consciousness or another, so long as in the personality then controlling the behavior, the defendant was conscious and his or her actions were a product of his or her own volition." 679 P.2d at 618. Again, no persuasive analysis was made which would support rejection of the insanity defense in a case like this. Moreover, the conclusion of the court in *Rodrigues* was that while the acquittal was error, the insanity defense *should* have been

submitted to the jury—which is our conclusion here.[21]

### D

*Defendant's Potential Criminal Responsibility for Actions Other than the Abduction of the Infant*

 The trial judge based his rulings—rejecting consideration of the insanity defense and refusing any instructions to the jury thereon—on the state of the evidence as to the alter personality or personalities said to be in control at the time of planning and carrying out the actual abduction of the child. Hence we first focused on the evidence as to that period of time and stated our holding that it was error to deny consideration of proof that the host or dominant personality was unable to appreciate the nature and quality or wrongfulness of her acts at the time of the abduction. However, the kidnapping statute envisages a continuing offense and the evidence of record spans a broader time frame. Title 18 U.S.C. § 1201(a) provides in part:

> (a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person ... when—
>> (1) the person is willfully transported in interstate or foreign commerce....
> shall be punished by imprisonment for any term of years or for life.

The broad language of § 1201(a) defines a continuing offense. *See United States v. Garcia*, 854 F.2d 340, 343 (9th Cir.1988), *cert. denied*, 490 U.S. 1094, 109 S.Ct. 2439, 104 L.Ed.2d 995 (1989). The Ninth Circuit has held that merely confining a victim, after she

---

**21.** By far the most extensive analysis by any state court was done by the Supreme Court of Washington in *State of Washington v. Wheaton*, 121 Wash.2d 347, 850 P.2d 507, 512–14 (1993). Finding that the record and the arguments of both the prosecution and defense failed to bring out enough information to make a reasoned choice between the two alternatives presented (which were identical to the choices presented by Denny–Shaffer and the government in this case) or to rule out other potential formulations of the defense in the case of MPD, the court declined to make a choice and affirmed the trial court's decision because of inadequacy in the record. *See id.* at 516–17.

We have also considered *Commonwealth v. Roman*, 414 Mass. 235, 606 N.E.2d 1333 (1993), an MPD case which followed the *Grimsley* opinion's rationale, without helpful analysis, that the focus for criminal responsibility must be on the mental state of the individual at the time of the commission of the offense. No consideration is given in such mechanical decisions to the forceful position that in determining the individual's responsibility under the criminal law, evidence on the host or dominant personality's consciousness and actions should be of paramount importance, and not dismissed as irrelevant.

willingly began to journey with the defendant, sufficed to serve as a violation of the statute even though the victim was not physically abducted or initially taken by force. *See United States v. Redmond,* 803 F.2d 438, 439 (9th Cir.1986), *cert. denied,* 481 U.S. 1032, 107 S.Ct. 1963, 95 L.Ed.2d 534 (1987); *United States v. Wesson,* 779 F.2d 1443, 1444 (9th Cir.1986) *(per curiam ).*[22] We agree with these interpretations of § 1201(a) and will accordingly consider the application of the kidnapping statute here to the actions of defendant in carrying out the abduction and also her actions subsequent to the abduction of the infant.

■ There is evidence in the record, considering this kidnapping as a continuing offense, which could support inferences that the defendant violated § 1201(a) while the host or dominant personality was active, which we hold is the proper focus in the multiple personality disorder case shown by this record. Under the *Redmond* and *Wesson* cases, we should consider the evidence as to actions in Texas and Minnesota as a basis for inferences that the host personality became aware of the wrongfulness of confining and holding the baby after the host learned that it was in possession of the child.[23] We feel that such evidence could support adverse inferences of guilt under § 1201(a) of confining and holding the baby if the host in fact had learned that the child had been kidnapped.

■ On the other hand, there is substantial evidence that raises an insanity defense for the defendant, viewed as the host personality, respecting such confining or holding the baby after the abduction. There is expert testimony by Dr. McCarty that MPD victims tend to cover up acts committed by their alters.[24] This proof, together with

---

**22.** *Cf. Chatwin v. United States,* 326 U.S. 455, 460, 66 S.Ct. 233, 235, 90 L.Ed. 198 (1946) (finding that the evidence failed to show that the defendants had confined the victim against her or her parents' wishes); *accord Garcia,* 854 F.2d at 345–46 (suggesting that the holding of two young girls by one defendant during a three month period following their actual physical abduction could suffice as a direct violation of the kidnapping statute).

**23.** Dr. McCarty testified on these matters in some detail:

Q. What did Gidget tell you about what happened or what she knows occurred after being in the parking lot at the hospital in Las Cruces?

A. She has very patchy memories, and she remembers driving. She still had the thought that they would go to Dallas. She remembers, I think, changing the baby's diaper, and she remembers, I think, a sign post that said "San Antonio."

THE COURT: What was that?

DOCTOR McCARTY: She remembers a road sign, "San Antonio."

Q. What does she remember, then, after that?

A. Then she remembers being in Bryan and, again, there are very patchy memories. She remembers going to an AA meeting with the baby, and actually—at that point she said that she introduced the baby as hers, and that's how she introduced it thereafter, but it was like that was a struggle, an internal struggle.

Q. Now, what was her sense or her reaction in the parking lot at the hospital in Las Cruces?

A. Just fear. I mean, she used those kinds of words, fear, shock.

. . . .

Q. What about Minnesota? What does Gidget tell you about Minnesota?

A. The thing that she told me about in Minnesota was that she remembered saying good-bye to her mother and Meaghan, and she left a card for them—or I think for both of them; that she has little snatches of memory, I think, about people holding the baby, like Shanhi holding the baby, but the most—the one that I can actually pin down is when she left.

VIII R. at 1007–10.

Q. [cross-examination by government counsel] Now, it's your testimony, based on what the defendant told you, that at certain times after she took the baby the primary personality knew that she was in possession of a child?

A. Yes.

Q. Is that true?

A. Yes.

Q. And at times that primary personality introduced that child as her own?

A. Yes.

*Id.* at 1065.

**24.** Dr. McCarty testified that one of the effects of MPD is to cause the host personality to try to "cover for" or ignore the actions of the alters. *See, e.g.,* VII R. at 923–24, 929–31; VIII R. at 940–41 (the host attempts to construct explanations for unexpected events caused by alters); *id.* at 942 (the host often lies in an attempt to conceal the illness); *id.* at 943 (some alters lie even when it causes problems which the host then must deal with); *id.* at 985 (describing how MPD patients often procure several sets of identification papers in attempts by the alters to establish their own identities); *id.* at 1003 (alters often take on characteristics of the host or present

some evidence that the defendant's host or dominant personality sought to conceal the baby after the abduction,[25] and the proof discussed earlier of the severity of this MPD case, all raised a question of fact on the insanity defense for the jury. We are convinced that the substantial showing of the disorder in defendant's mental perceptions presented a genuine issue whether the defendant's host or dominant personality, at these later times after the abduction of the child, was unable to appreciate the nature and quality or wrongfulness of her acts during the subsequent confinement and holding of the child.

 Thus if the evidence is substantially the same on retrial, the insanity defense should be submitted to the jury as it bears on the alleged violations of the kidnapping law in carrying out the abduction and also in the later actions during the confine-ment, holding, and transportation of the infant.[26]

 We note that several of the actions in question before and after the abduction of the infant here were arguably steps that aided or abetted the accomplishment of the kidnapping. This might suggest that the host personality could be found liable for aiding or abetting the alter or alters who abducted the child. Since the case is to be remanded for a new trial, we will note that no aiding and abetting theory in these circumstances should be submitted to the jury. "One must ... aid or abet someone else to commit a substantive offense. One cannot aid or abet himself." *United States v. Martin*, 747 F.2d 1404, 1407 (11th Cir.1984).[27] We are not persuaded that in determining liability for aiding and abetting, alter personalities should be recognized as distinct legal persons, with independent status under the criminal laws, who may be aided and abetted.[28] As we have held, it is the host or

themselves as the host in order to not call attention to the disorder); *id.* at 1100 (MPD patients often attempt to cover up events in their lives caused by alters which they do not understand). The host personality generally does not know about the existence of the alters. *See* Frank W. Putnam, Diagnosis and Treatment of Multiple Personality Disorder 114 (1989). This leads, "more often," to the host actively denying evidence of the existence of alters, and may even cause the host to flee from treatment when confronted with evidence of alters. *See id.* at 107. What the MPD victim does know is that, like Denny–Shaffer, they blank out or lose time and are later accused of doing things they deny having done. When they are confronted with such situations as "'waking up' in the middle of conversations [with] people whom they do not know," they simply do not know what to think and attempt to cover up to avoid others discovering their "problems." *See* Saks, 25 U.C. Davis L.Rev. at 397–98; VIII R. at 1018.

**25.** Respecting the time of the defendant's arrest in Albuquerque, Dr. McCarty said that "the difficulty here is that I am not sure I know who answered [whether the baby was the one taken from Las Cruces], although what we have is that Bridget reports that Gidget answered, and how Gidget came by that knowledge is the other issue." VIII R. at 1074; *see also id.* at 1018–22.

Dr. McCarty also discussed the actions of the defendant when Genesis, defendant's daughter, was told to hide the baby at the time they were stopped in Albuquerque. Dr. McCarty said that "it doesn't sound like [Gidget] had figured it out all together ... what this baby was. That it would just be an analogy. It is like when she woke up when she was seven and there were crumbs [when she should have been fasting before communion]. It is like what you can't explain, you hide." *Id.* at 1018.

**26.** While transportation in interstate or foreign commerce of the kidnapped victim is an essential jurisdictional element of a § 1201(a) offense, it need not be established that the defendant in question participated in such transportation, but merely that the victim was at some point during the offense transported in interstate or foreign commerce. *See United States v. Jackson*, 978 F.2d 903, 910–11 (5th Cir.1992), *cert. denied sub nom., Comacho v. United States*, —— U.S. ——, 113 S.Ct. 3055, 125 L.Ed.2d (1993).

**27.** *See also United States v. Langston*, 970 F.2d 692, 705 & n. 12 (10th Cir.) (proof must establish commission of offense by someone and aiding and abetting by defendant so charged), *cert. denied sub nom., Francis v. United States*, —— U.S. ——, 113 S.Ct. 439, 121 L.Ed.2d 358 *and cert. denied sub nom., McIlroy v. United States*, —— U.S. ——, 113 S.Ct. 479, 121 L.Ed.2d 384 *and cert. denied sub nom., Ross v. United States*, —— U.S. ——, 113 S.Ct. 495, 121 L.Ed.2d 433 (1992), *and cert. denied sub nom., McIlroy v. United States*, —— U.S. ——, 113 S.Ct. 1872, 123 L.Ed.2d 491 (1993).

**28.** It has been suggested that under relevant scientific and psychological criteria, alters should be considered distinct legal persons. *See* Saks, 25 U.C.Davis L.Rev. at 403–18; Daniel C. Dennett, Consciousness Explained 419–20, 422, 424–25 (1991). Our criminal jurisprudence, however, does not warrant entering into such an analysis.

dominant personality which must be the focus of the determination of possible criminal responsibility respecting the kidnapping charge and the insanity defense asserted here.

## VII

In sum, we hold that the trial judge erred in rejecting evidence respecting the ability or inability of the host or dominant personality to appreciate the nature and quality or wrongfulness of her acts in kidnapping the infant here, and in limiting his consideration strictly to evidence pertaining to the alter or alters that were in control at the time of the abduction, in making his rulings on a possible insanity defense under 18 U.S.C. § 17. We therefore must reverse and remand for a new trial.

On the retrial, if the evidence bearing on the alleged violation of 18 U.S.C. § 1201 and the insanity defense is substantially the same as is before us, the insanity defense should be submitted to the jury.[29] Along with other required instructions concerning the kidnapping charge, the jury should be instructed that it should find whether the government has carried its burden of proving the essential elements of the offense, including transportation in interstate commerce by someone after the abduction; whether the defendant violated the kidnapping law by unlawfully seizing, confining, inveigling, decoying, kid-

napping, abducting or carrying away the infant and holding it for ransom, reward or otherwise; and that the various actions of the defendant taken during the continuing course of conduct in carrying out the abduction and thereafter until the recovery of the infant may be considered.

 In connection with the insanity defense asserted, the jury should be instructed in accord with 18 U.S.C. §§ 17 and 4242(b) that the defendant has the burden of proving her insanity defense by clear and convincing evidence; that by such evidence she must show that she was suffering, at the times in question, from a severe mental disease or defect; that as a result thereof, she was unable to appreciate the nature and quality or the wrongfulness of her actions in committing any violations found; and that if she has made such a showing then she is entitled, although she be found to have committed the offense charged, to be found not guilty only by reason of insanity.[30]

The jury should be further charged that in connection with the insanity defense presented here, it should determine whether defendant has carried her burden of showing a severe mental disease or defect from the evidence of her alleged multiple personality disorder, with an alleged host or dominant personality and an alter personality or personalities present and controlling her actions

---

**29.** We note again that the trial judge recognized that the waiver of jury trial by the defendant after his rejection of the insanity defense applied only to the proceeding at that stage; he said that if there were a retrial, the defendant's right to a jury trial was not waived for that retrial. *See* IX R. at 1160–61.

**30.** Should such a verdict be returned, there is no danger that the defendant would go free to walk the streets. A federal insanity acquittee is remanded to the custody of the Attorney General, who may institute proceedings to commit that person to a state or federal facility for treatment until he or she is no longer dangerous. *See* 18 U.S.C. § 4243. The Supreme Court has held that it is constitutional to detain an insanity acquittee for as long as it is necessary to render the person no longer dangerous to the public, even if that should take longer than the maximum sentence for the crime which the defendant committed. *See Jones v. United States*, 463 U.S. 354, 370, 103 S.Ct. 3043, 3053, 77 L.Ed.2d 694 (1983). In fact, one study found that the average term of confinement for an insanity acquittee

was just over 9½ years. *See* Perlin, 40 Case W.Res.L.Rev at 651 & nn. 231–232. In this case, Denny–Shaffer's sentence was 5¼ years.

Once a defendant is acquitted on the basis of insanity and the Attorney General decides to confine him or her, the Attorney General may require state officials to accept federal conditions on the defendant's confinement in a state facility. *See United States v. Husar*, 859 F.2d 1494, 1497 (D.C.Cir.1988) (per curiam), *reh'g denied*, 866 F.2d 1533 (en banc), *cert. denied*, 492 U.S. 909, 109 S.Ct. 3223, 106 L.Ed.2d 572 (1989). Sections 4243 and 4247 require "continued federal control over federal insanity acquittees even after the acquittee is placed by the Attorney General in state custody." *Id.* Only a federal court may later determine that the acquittee can be safely released. *See id.* If Denny–Shaffer were acquitted on this basis, she would presumably be committed to the custody of the New Mexico Secretary of Health and Environment for treatment. *See* N.M.Stat.Ann. § 43–1–1(E) (Michie 1992).

at various times; that if the jury so finds, then its determination of criminal responsibility and whether the insanity defense has been established should be based on the evidence concerning the actions and the ability of the host or dominant personality to appreciate the nature and quality of the defendant's acts or the wrongfulness thereof during the carrying out of the abduction and subsequent acts until the recovery of the infant.

Accordingly, the judgment of conviction and the sentence imposed are **REVERSED** and the case is **REMANDED** for further proceedings in accord with this opinion.

LOGAN, Circuit Judge, concurring:

I concur in most of what is said in Judge Holloway's opinion and its result. I agree that if defendant has a host personality and proves by clear and convincing evidence that an alter or alters were in control when the crime was committed, and that the host personality had no control over the alter personality during the commission of the crime, then defendant is entitled to a verdict of not guilty by reason of insanity.

I agree with the majority that if the individual has a medically definable host personality, then the "defendant" is that host personality for purposes of 18 U.S.C. § 17. I think this follows from psychiatric science's best possible definition of who the individual "is." Consequently, if during the events in question an alter was the extant personality, the defendant must ordinarily be given the opportunity to prove that the host was unaware of the alter's actions, or did not appreciate their wrongfulness. This standard will not open the floodgates to a host of "the devil made me do it" defenses. The defendant must satisfy her burden of production by presenting credible evidence that she suffers from multiple personality disorder (MPD), such that a jury could find by clear and convincing proof that the host personality was not in control or did not understand the nature and quality or wrongfulness of the alter's actions.

I write principally to note that it may not be as difficult for the government to prevail as Judge Holloway's opinion might suggest.

Federal Rule of Evidence 704(b) prohibits expert witnesses from expressing a view on the ultimate question of insanity at a trial. Thus, as Judge Holloway's opinion acknowledges, if there is sufficient evidence to permit the submission, then the determination of whether the defendant had the mental capacity "to appreciate the nature and quality or the wrongfulness of [her] acts," 18 U.S.C. § 17(a), is strictly a jury question. Because the district court rejected the defense theory of the insanity defense at the close of the defense's presentation, the government did not present rebuttal testimony. The record contains only the report of the government's expert.

Judge Holloway's opinion does not focus on the possibility that the host personality was a participant in planning the abduction, which, of course, also would subject defendant to liability. In the instant case there were pretentions of pregnancy over a long period before the abduction. Apparently hospitals were scouted, checks were made of defendant's ex-boyfriend's blood type, and baby clothes were acquired. One or more elaborate schemes were concocted for defendant to acquire a baby. Human placenta and apparently blood were stolen from the hospital to create the impression of defendant's ostensible delivery of the abducted baby. The jury would be entitled to find these are the acts of a mentally disturbed but highly educated nurse host personality desperate to hold on to a lost boyfriend. As Judge Holloway's opinion notes, there was also a two-week period after the abduction during which the host personality was at least sometimes aware of her possession of the baby.

The evidence is strong enough that I think it is a close question whether a reasonable jury could find a verdict of not guilty for Gidget, the host personality, on the insanity defense. But the defendant's psychiatrist testified that MPD individuals tend to cover up the acts committed by their alters, and if concealing evidence of the alters' activities is actually caused by MPD then it too fits into an insanity defense. I believe that this testimony of the defendant's psychiatrist, taken together with her testimony that the host personality Gidget had no part in the plan-

ning or the carrying out of this activity, is enough to create an issue for the jury's determination.

Thus, I concur.